169 So.2d 282

George T. ROGERS et al.

v.

CITY OF MOBILE et al.

I Div. 95, 95–A to 95–C.

Supreme Court of Alabama.

July 31, 1964.

Rehearings Denied Dec. 10, 1964.

Lyons, Pipes & Cook, Mobile, for appellant Rogers.

Sam M. Johnston, Bert S. Nettles and Johnston, Johnston & Courtney, Mobile, for appellant Boyes.

Wm. R. Lauten, Pillans, Reams, Tappan, Wood & Roberts, Wilkins, Stephenson & Byrd and Vickers, Riis, Murray & Curran, Mobile, and Wm. Alfred Rose, Ellene Winn, Harry R. Teel and White, Bradley, Arant, All & Rose, Birmingham, for appellees.

Richmond M. Flowers, Atty. Gen., and Robt. P. Bradley, Asst. Atty. Gen., for the State.

GOODWYN, Justice.

These six related appeals from two decrees of the circuit court of Mobile County, in equity, (herein referred to as the August 13th and August 31st decrees), rendered in the same case, were submitted here on one record by agreement of the parties. Also before us are petitions for certiorari under Supreme Court Rule 18, filed by intervenor-appellant Earl T. Boyes in connection with his appeals.

We have concluded that the decrees should be affirmed and the petitions for certiorari denied.

At the outset, it seems appropriate to observe that this is not the usual or ordinary case, either in the size of the record and briefs or the number and complexity of the questions presented. In preparing the opinion, we are persuaded there should be a minimum of discussion, consistent with readability and an understanding of the decisive issues presented and our holdings with respect to such issues. Otherwise, the result might well be an acceptance of the invitation to undue expansiveness, which the case proffers.

The proceeding was initiated by George T. Rogers, an appellant in 1 Div. 95, by the filing of a bill of complaint as a citizen and taxpayer of the City of Mobile and the State of Alabama, on behalf of himself and other taxpayers and citizens of the City and State. Made respondents to the bill, as last amended, were the City of Mobile, the Board of Commissioners of the City, the President and other members of said Board, the Director of the Alabama State Docks Department, Southern Industries Corporation, and Henderson Sugar Refinery, Inc. The bill, as last amended, seeks to enjoin the respondents from consummating a plan originally outlined in a preliminary agreement which, as modified, consists of six proposed agreements, hereinafter summarized, which we shall refer to as the Ground Lease, the Project Lease, the Mortgage and Deed of Trust, the Employment Agreement, the Service Requirements Agreement, and the Guaranty Agreement.

Earl T. Boyes, a citizen and taxpayer of the City and State, became an intervenor in the suit, and joined in Rogers' prayer for an injunction and also sought a declaratory decree holding said plan to be unlawful.

Basically, the case concerns the statutory and constitutional validity of a rather involved plan for financing, constructing, leasing, and operating a project at the Port of Mobile, consisting of the following: A wharf with loading and unloading facilities, a wharf access bridge, storage facilities, conveyer and bulk handling facilities, and facilities for the refining and processing of sugar and the extracting and packaging of by-products therefrom. The parties involved in the plan are the City of Mobile (City), the Alabama State Docks Depart-

ment (Department), Alabama Docks Refinery Operating Company (Operating Company), Henderson Sugar Refinery, Inc. (Henderson), and Southern Industries Corporation (Southern).

Briefly stated, the plan contemplates that the Department will lease to the City unimproved real estate on which the City will construct the project, which will be financed by revenue bonds of the City and leased back to the Department by the City; that the Department will employ the Operating Company to operate a portion of the project, and the Department will operate the remainder of the project with other personnel; that Henderson will be a customer of the Department under a service requirements agreement between them; and that performance by Henderson and the Operating Company of their respective obligations will be guaranteed by a guaranty agreement.

The six proposed agreements may be summarized as follows:

### 1. Ground Lease

Under a ground lease between the Department, as lessor, and the City, as lessee, the Department leases to the City, for a term of fifty years, a tract of unimproved land located at the Port of Mobile, and the City agrees to construct and equip the project. The obligation of the City to pay for said construction and equipment is limited solely to the proceeds from the sale of its revenue bonds hereinafter referred to, including income from the investment thereof and insurance and penalty proceeds. Title to the project will vest in the State upon termination of the ground lease.

### 2. Project Lease

The City, as lessor, leases to the Department, as lessee, the project and the land on which it will be constructed. The term of the project lease is forty years from completion of the project, and the Department agrees to pay to the City, commencing on the completion of the project, rent in amounts sufficient to enable the City to pay the principal of and interest on the revenue bonds of the City hereinafter referred to and the fee of the trustee under the mortgage and deed of trust hereinafter referred to. The project lease contains agreements on the part of the Department to keep the project insured and to maintain the project in good repair and in efficient and modern condition. All obligations on the part of the Department under the project lease for the expenditure of any money are limited obligations and (except to such extent as they may be payable from insurance proceeds or condemnation awards) are payable solely (a) out of the first gross operating revenues derived by the Department from the project, and (b) to such extent, if any, as the said first gross operating revenues should not be sufficient to make said rental payments, out of the first gross operating revenues derived by the Department from the operation of its other presently existing port facilities located at the Port of Mobile remaining after (aa) payment of the expenses of operating and maintaining the said other port facilities, and (bb) payment of the principal of and interest on certain bonds of the State and the Department having prior claims on said revenues. The project lease grants to the Department the option of terminating both the ground lease and the project lease when the mortgage and deed of trust hereinafter referred to shall have been satisfied, and further provides that upon either the expiration of the term covered by the ground lease or upon prior termination thereof the project and the land on which it is constructed will revert to the State.

### 3. Mortgage and Deed of Trust

The City will enter into a mortgage and deed of trust with a corporate trustee as security for the revenue bonds that the City will issue to pay the costs of constructing the project. In the mortgage and deed of trust the City conveys to the trustee thereunder the project lease, the City's interest under the ground lease, and all

revenues that will be derived by the City from the project. The bonds are payable solely out of the revenues derived by the City from the leasing and operation of the project, and provide on their face that the covenants on the part of the City in the bonds and in the mortgage and deed of trust shall never constitute a personal or pecuniary liability or charge against the general credit of the City, that in the event of breach of any such covenant the liability of the City therefor shall be limited to the revenues derived from the project, that no holder of the bonds shall ever have a right to compel the exercise of the taxing power of the City or the use of any funds other than those derived from the project for payment of the principal of or interest on the bonds, and that the bonds shall not constitute a debt of the City within the meaning of any State constitutional or statutory provision. A similar limitation of liability is contained in the mortgage and deed of trust.

### 4. Employment Agreement

The Department, by an employment agreement, will employ the Operating Company as its agent to operate and maintain those parts (hereinafter sometimes referred to as "the plant facilities") of the project other than the wharf and unloading facilities (hereinafter sometimes referred to as "the wharf facilities"). The Operating Company is a corporation wholly owned by Henderson.

The employment agreement contains agreements on the part of the Operating Company to maintain and use, in the operation of the plant facilities, an able staff experienced in the operation of facilities similar to the plant facilities and competent to operate the plant facilities at their maximum efficiency; to provide all office and plant furniture, movable equipment, supplies and other personal property (other than raw sugar) needed for operation of the plant facilities and for maintenance of said records and rendition of reports; and to provide the necessary working capital for the plant facilities by advancing from its own funds all sums needed for payment of operation and maintenance expenses and the costs of capital improvements to the plant facilities. The Department agrees to reimburse the Operating Company for the sums advanced by the latter for such operation and maintenance expenses and capital improvements, and to pay to the Operating Company, as compensation for its services under the employment agreement, a sum equal to 13.-0434% of the gross operating revenues of the plant facilities.

All obligations of the Department for the payment of moneys under the employment agreement are payable solely from the same sources as those from which the said rent is payable. See: "2. Project Lease," supra. The employment agreement will extend for a period of thirty years from the completion of the project, subject to rights of prior termination by the Department in the event of default by the Operating Company.

The employment agreement excepts from its provisions the wharf facilities forming a part of the project and provides that the said wharf facilities are to be operated by the Department as an operation separate from the plant facilities, and that the fees for dockage, wharfage, transportation and other services rendered by the said wharf facilities shall not be deemed to constitute income from the plant facilities, but shall be deemed to constitute separate income to the Department from the wharf facilities.

### 5. Service Requirements Agreement

Under this agreement between the Department and Henderson, the latter agrees to cause its entire requirements for the processing of raw sugar to be presented at the plant facilities for processing, and the Department agrees to process and package the raw sugar so presented and to extract and package the molasses and any other byproducts resulting from the refining process. The respective obligations of the Department and Henderson as to the said

processing requirements are limited to the capacity of the plant facilities; and the Department reserves the right to render services from the plant facilities to others than Henderson whenever any part of the capacity of the plant facilities may not at the time be in use rendering service to Henderson.

In the service requirements agreement Henderson agrees to pay to the Department sums that will assure receipt by the Department of revenues from the plant facilities sufficient (a) to pay the rent payable by the Department to the City under the project lease; (b) to pay all costs incurred by the Department in the operation, maintenance and improvement of the plant facilities, including all compensation to and reimbursement of the operating company under the employment agreement (except that part of said costs paid by other customers of the Department); and (c) to yield a profit to the Department that will become a part of its general operating revenues. All obligations of Henderson under the service requirements agreement will continue regardless of whether Henderson has any requirements for the processing of sugar, and regardless of whether all or any part of the plant facilities should be damaged or destroyed or taken in the exercise of eminent domain, and regardless of any acts or circumstances that may constitute commercial frustration of purpose. The aforesaid payments by Henderson will be in addition to the charges by the Department for services rendered to Henderson by the Department at the wharf facilities. The service requirements agreement will extend for a period of thirty years from the completion of the project, subject to rights of prior termination by the Department in the event of default by Henderson.

### 6. *Guaranty Agreement*

In this instrument, Southern, Henderson, and the Operating Company are the guarantors, and the Department, the City and the trustee under the mortgage and deed of trust are the obligees. Southern and Henderson unconditionally guarantee the prompt and faithful performance by the Operating Company of all the obligations on the part of the Operating Company contained in the employment agreement, and Southern and the Operating Company unconditionally guarantee the prompt and faithful performance by Henderson of all the obligations on the part of Henderson contained in the service requirements agreement.

Each of the respondents below demurred to Rogers' amended complaint and also demurred to and answered Boyes' amended bill of intervention. The trial court reserved its rulings on these demurrers until after a hearing on the merits of Boyes' amended bill of intervention. Evidence was offered at that hearing, including, inter alia, evidence as to (1) the wisdom, propriety and desirability of various actions proposed to be taken by the City and the Department in consummation of the plan; (2) certain understandings or agreements that, if the plan should be consummated, (a) the Department would purchase from Henderson the land on which the project will be constructed, and (b) the City would acquire certain engineering drawings from Henderson and would require the contractor who would construct the project for the City to purchase certain machinery from Henderson at a price to be determined by a formula already agreed upon; (3) the processing, packaging and storage operations which the Department proposes to carry on at the project; and (4) several processing, packaging and storage operations that for many years have been carried on, and at the time of the hearing were being carried on, at the Port of Mobile in buildings owned by the Department in connection with various products shipped into and out of said port.

At the conclusion of the hearing, the trial court, on August 13, 1962, rendered a decree which, in summary, sustained the respondents' demurrers to the complaint; gave complainant ten days in which to amend; held the following: That "the

project as intended and proposed to be consummated will be a lawful undertaking," that "the City, the Board of Commissioners of the City of Mobile and the members thereof, and the Director of the Department had power and authority to enter into the preliminary agreement dated September 19, 1961, attached as Exhibit 'A' to the bill of complaint in this cause, and have power and authority to enter into and consummate each of the documents, instruments and agreements mentioned in said preliminary agreement and attached as Exhibits 'B', 'C', 'D', 'E' and 'F' to the bill of complaint as last amended (viz.: Exhibit 'B'—Ground Lease; Exhibit 'C'—Mortgage and Deed of Trust; Exhibit 'D'—Project Lease; Exhibit 'E'—Employment Agreement; Exhibit 'F'—Service Requirements Agreement)," and that "the service requirements agreement attached as Exhibit 'F' to the bill of complaint as last amended is not lacking in mutuality," dismissing the bill of intervention of Earl T. Boyes (an appellant in 1 Div. 95 and 95A and the only appellant in 1 Div. 95B and 95C); and taxed the costs "incident to the proceedings in intervention * * * one-half (½) to the intervenor and one-half (½) to the respondents" (appellees in 1 Div. 95, the original appellants in 1 Div. 95A and appellees in 1 Div. 95B and 95C).

Rogers, having declined to plead further, the trial court, on August 31, 1962, rendered a decree dismissing his amended complaint and taxing to him the costs, other than those "in the proceedings in intervention."

A summary of the six appeals is as follows:

The appeal in 1 Div. 95 was brought by Rogers from the decree of August 31 dismissing his amended complaint. The issue on this appeal concerns the lawfulness of the plan as embodied in the six agreements.

Boyes' subsequent appeal in 1 Div. 95 also is from the decree of August 31 and presents the same issue as in Rogers' appeal.

The respondents' appeal in 1 Div. 95A is is from the August 13th decree. The issue presented is whether the trial court abused its discretion in taxing to respondents any part of the costs in the intervention proceeding.

Boyes' subsequent appeal in 1 Div. 95A also is from the August 13th decree. The issues on this appeal concern the lawfulness of the plan as embodied in the six agreements and whether it was error to tax Boyes with any part of the costs in the intervention proceeding.

Boyes' appeal in 1 Div. 95B, also from the August 13th decree, presents the same issues as those in his appeal in 1 Div. 95A.

Boyes' appeal in 1 Div. 95C is from the August 31st decree and presents the same issues as those in his appeal in 1 Div. 95.

The respondents have filed motions to dismiss Boyes' appeals, and also insist in argument, insofar as Boyes' appeals are concerned, that the decrees appealed from should be affirmed (after correction of the August 13th decree so as to tax all costs in the intervention proceeding to Boyes) or the appeals dismissed, because of certain procedural defects. Since the issues presented in Rogers' appeal in 1 Div. 95 (concerning the lawfulness of the plan as embodied in the six agreements) and in respondents' appeal in 1 Div. 95A (questioning the taxing of costs in the intervention proceeding) are in substance the same as those presented in Boyes' appeals, and in view of our conclusion that the decrees appealed from should be affirmed, we see no need of discussing these claimed procedural defects.

We shall consider first the question of statutory authority for the City and the Department, respectively, to enter into and carry out the said plan as embodied in the six proposed agreements.

## STATUTORY AUTHORITY

We observe, as a prelude to discussing the questions before us, that the transactions

between the City and the Department, here involved, are similar in substance to transactions already considered and approved by this court in two decisions, where the City assisted the Department, or its predecessors (all being referred to hereinafter as the Department), in the State's program of seaport and harbor promotion and development, by constructing facilities pursuant to arrangements under which the facilities ultimately became the property of the State. See: State ex rel. Radcliff v. City of Mobile, 229 Ala. 93, 155 So. 872, and Lang v. City of Mobile, 239 Ala. 331, 195 So. 248. (Hereinafter referred to as Radcliff and Lang, respectively.) As will appear from the discussion which follows, the statutes under which the City and the Department now propose to act are the same as those involved in said cases, except for amendments which have not impaired the holdings there made.

1. *The Ground Lease.*

The statutory authority for the Department to execute the ground lease as lessor is Code 1940, Tit. 38, § 18. That statute authorizes the Department, with the consent and approval of the Governor, to "lease to others * * * for reasonable compensation, any * * * property" under the management and control of the Department. The same statute (Act No. 1, § 7, appvd. Jan. 17, 1927, Gen.Acts 1927, pp. 1, 6) was held in Radcliff to constitute express statutory authority for a lease by the Department to the City of unimproved real estate on which the City proposed to construct facilities to be used thereafter by the Department.

It is contended that the ground lease is, in effect, prohibited by the last sentence of § 18, Tit. 38, viz.:

"* * * The proceeds from all leases shall become a part of the operating fund."

■ The argument is that the quoted sentence restricts the Department to the leasing of property only when the consid-

eration for the lease is payable in money; that the consideration flowing to the Department under the ground lease is not money but, instead, is the agreement of the City to construct the project, which cannot "be put into the operating fund." The point is not well taken. There is no requirement in § 18 that rental payable by a lessee of the Department must consist of money only. That section simply requires that the proceeds from leases shall become "a part of" the operating fund. A fund frequently may have assets, other than money, that are held as a part of the fund. We see no good reason why the project here could not be so held; that is, the profits received by the Department from the operation of the project would become a part of the operating fund, and, when full title to the project vests in the State on termination of the ground lease, the project would become an asset of the operating fund.

■ The City's authority to enter into the ground lease, as lessee, is derived from its statutory power to construct the project. It seems axiomatic that the authority to construct facilities includes the power to acquire real estate therefor. In Radcliff (229 Ala., at p. 97, 155 So. 872) we held that the statute authorizing the City to construct certain facilities constituted statutory authority also for acquisition by the City of a leasehold interest in the real estate on which it proposed to construct the facilities.

The City has authority to construct the project under each of two separate statutory provisions. One is contained in what, as originally adopted (Act No. 154, appvd. June 26, 1935, Gen.Acts 1935, p. 195), was commonly referred to as the "Lee Act" now codified as §§ 341 through 351, Tit. 37, Code 1940, as amended. For brevity, we shall refer to that statute, as codified and amended, as the "Lee Act."

Under the Lee Act, a municipality is authorized to acquire and construct "an undertaking," which is defined in § 341, Tit. 37, to the extent here pertinent, as consisting of each or any combination of two or more of the following:

"* * * [D]ocks, piers, wharves, seaport or river terminals, * * * warehouses * * * and any other plants, works, machinery or equipment useful for the preservation or preparation of agricultural products for market or use and for the conversion of agricultural products into useful and marketable condition and for the conversion of the same into usable and marketable products. * * *"

The other statutory provision authorizing construction of the project is § 470, Tit. 37, Code 1940, as amended by Act No. 820, appvd. Sept. 8, 1961, Acts 1961, Vol. II, p. 1206, which provides that:

"The * * * governing body of any town or city * * * may construct * * * wharves and construct buildings and other improvements on and near wharves and wharf sites * * *."

■ The project consists of facilities that fall within the definition of an "undertaking" in the Lee Act, including a wharf, wharf access bridge (which is in the nature of a pier), loading and unloading facilities, conveyor and bulk handling facilities, storage facilities (which are in the nature of a warehouse), and a plant, works, machinery and equipment especially useful for the preparation of raw sugar (which is an agricultural product) for market or use by converting it into usable and marketable condition and into usable and marketable products.

■ We see no merit in the contention that a restriction should be read into the Lee Act to the effect that facilities constructed thereunder for processing agricultural products must be facilities for the processing of agricultural products forming a significant or important part of the agriculture of Alabama. There is nothing in the statute justifying such a restriction. Nor is there merit in the contention that the language of a later statute, Act No. 756, appvd. Sept. 6, 1951, Acts 1950–51, Vol. II, p. 1307, known as the "Wallace Act," should be interpreted as containing such a restriction. We do not interpret the Wallace Act as containing such a restriction. But even if it should be so interpreted, we see no reason why the recitals of legislative purpose set forth in the Wallace Act, enacted in 1951, should be read into the definition of an "undertaking," as above quoted from the Lee Act, which was passed some sixteen years earlier.

The project also constitutes "wharves * * * and buildings and other improvements on and near wharves and wharf sites," within the meaning of the language we have quoted above from § 470, Tit. 37, as amended. A similar statute (§ 2018, Code 1923) was interpreted in Radcliff and Lang. In Radcliff, we held that a pier, a slip, a cold storage plant, a banana handling plant, and a grain elevator constituted "wharves and * * * buildings and other improvements upon wharves," within the meaning of § 2018, Code 1923, which, as thereafter amended (Act No. 37, appvd. Feb. 17, 1939, Gen.Acts 1939, p. 38), was brought forward into the present Code as § 470, Tit. 37. In Lang, we held that the quoted phrase from § 2018 embraced a project consisting, among other things, of wharves, railway engines, cranes, fertilizer handling equipment, and special facilities for handling various classes of cargo.

2. *The Mortgage and Deed of Trust.*

■ Since the project is an "undertaking," as defined in the Lee Act, the City has authority, under the express provisions of that Act (Code 1940, Tit. 37, § 342, as amended by Act No. 880, appvd. Sept. 8, 1961, Acts 1961, Vol. II, p. 1383) not only to construct the project but also to issue its revenue bonds therefor and make the proposed mortgage and deed of trust. The Lee Act (§ 342, Tit. 7, Code 1940, as amended, supra) authorizes any municipality

"* * * to issue revenue anticipation bonds to finance * * * the cost of the acquisition, construction * * * of any undertaking and to

pledge to the punctual payment of the principal of and interest on said bonds all or any part of the gross or net revenues of or rentals from such undertaking * * *; to pledge or to mortgage or execute deeds of trust or to create liens upon any undertaking * * *."

The Lee Act has been before this court a number of times, and revenue bonds issued thereunder have been consistently upheld. See: Taxpayers and Citizens of City of Mobile v. Board of Commissioners of City of Mobile, 252 Ala. 446, 41 So.2d 597; Chamberlain v. Board of Commissioners of City of Mobile, 243 Ala. 662, 11 So.2d 724; Lang v. City of Mobile, 239 Ala. 331, 195 So. 248, supra; Randall v. State, ex rel. City of Tuskegee, 233 Ala. 446, 172 So. 277.

### 3. *The Project Lease.*

The City has express statutory authority to enter into the project lease, under which it will lease the project back to the Department. It has the authority both under the Lee Act and under § 470, Tit. 37, Code 1940, as amended, supra.

The Lee Act (§ 342, Tit. 37, as amended, supra) provides that:

" * * * [A]ny municipality shall have power * * * to lease any undertaking or portion thereof to any agency or department of the State of Alabama for a period or periods not exceeding forty years * * *."

Section 470, Tit. 37, as amended, supra, contains similar provisions authorizing leases by a municipality of "wharves or sites for wharves * * * and any buildings or other improvements * * * on or near any wharf or wharf site * * * for a period or periods not exceeding forty years * * *."

In Lang, we held that the predecessor statute of § 470 (§ 2018, Code 1923, as amended by Act No. 37, appvd. Feb. 17, 1939, Gen.Acts 1939, p. 38, supra) expressly conferred on the City the power to execute,

as lessor, a lease similar to the project lease.

The most recent amendments of §§ 342 and 470, Tit. 37, Code 1940, supra, were made by Act No. 880 and Act No. 820, respectively, supra, which were enacted in 1961. The contention is made that each of said amendatory Acts violates § 45, Constitution 1901, because it is not germane to the statute it amends, because it contains more than one subject, and because its subject is not clearly expressed in its title. It is contended also that Act No. 820 is void for uncertainty. We find no merit in these contentions.

The additional powers conferred on municipalities by Act No. 880 clearly are germane to the powers conferred on municipalities by § 342 as it was before the amendment. Section 45 of the Constitution is not violated by the adoption of a statute amending a section of the Code if the subject matter of the amendatory statute is germane to that of the Code section being amended. See: Dorsky v. Brown, 255 Ala. 238, 51 So.2d 360, cert. den. 342 U.S. 818, 72 S.Ct. 34, 96 L.Ed. 619; Davis v. City of Tuscumbia, 236 Ala. 552, 183 So. 657; McCord v. Bridges, 211 Ala. 295, 100 So. 469.

The title of Act No. 880 is also sufficient. It contains an adequate summary of the new provisions being added to § 342. The applicable rule is thus stated in In re Opinion of the Justices, 262 Ala. 345, 349, 81 So.2d 277, 281:

" * * * It is sufficient to say that the title of an act need not be an index to it nor need it catalogue all powers intended to be bestowed. When the subject is expressed in the title in general terms, everything which is necessary to make a complete enactment in regard to it, or which results as a complement of the thought contained in the general expression, is included in and authorized by it. Kendrick v. Boyd, 255 Ala. 53, 51 So.2d 694; Dearborn v. Johnson, 234 Ala. 84, 173 So. 864."

274

Section 470, Tit. 37, as amended, supra, both prior to and after its amendment by Act No. 820, might be described as a statute which confers on municipalities powers respecting the construction, maintenance and leasing of wharves, wharf sites, and pertinent buildings and improvements. The changes made to § 470 by Act No. 820 consist of (1) changing from thirty to forty years the term for which municipalities may make leases under that section, and (2) revising the statutory language so as to make it clear that its provisions relate to buildings and other improvements adjacent to wharves and wharf sites, as well as to buildings and improvements constructed on wharves and wharf sites. These changes are germane to the subject matter of § 470 as it existed prior to its enactment by Act No. 820. See: Dorsky v. Brown, supra; Davis v. City of Tuscumbia, supra; and McCord v. Bridges, supra. Also, the subject of Act No. 820 is clearly expressed in its title, as required by § 45, Constitution 1901. See: Kendrick v. Boyd, supra; Newton v. City of Tuscaloosa, 251 Ala. 209, 36 So.2d 487; Alldredge v. Dunlap, 240 Ala. 27, 197 So. 36.

With respect to the contention that Act No. 820 is uncertain in meaning, it is argued that the word "near", added to § 470 by said Act, is so vague and indefinite that this court cannot give it meaning. We are unable to agree.

In Cooper Transfer Company v. Alabama Public Service Commission, 275 Ala. 99, 152 So.2d 424, this court said:

" * * * The precise import of such words as 'on,' 'near,' 'at,' and 'along,' are relative terms and the precise import of such words when used as descriptive of a place or location can only be determined by the surrounding facts and circumstances."

We see no basis for declaring Act No. 820 to be void for uncertainty when the meaning of the word "near," in any particular case, can be determined "by the surrounding facts and circumstances." As said in Pedrick v. Raleigh & P. S. R. Co., 143 N.C. 485, 55 S.E. 877, 10 L.R.A.(N.S.) 554, the word "near" should be construed as "a relative term, depending, for its signification, on the subject-matter in relation to which it is used and the circumstances under which it becomes necessary to apply it to surrounding objects." "The word 'near' is relative in its signification. * * * Each case must be governed by its special circumstances." Kirkbride v. Lafayette County, Missouri, 108 U.S. 208, 2 S.Ct. 501, 27 L.Ed. 705.

Every presumption is in favor of the constitutionality of an Act of the legislature and this court will not declare it invalid unless, in its judgment, the Act clearly and unmistakably comes within the inhibition of the Constitution. As observed in In re Opinion of the Justices, 247 Ala. 66, 22 So.2d 521, the court's power to annul a statute as violative of the Constitution "is a delicate one, and to be used with great caution." We entertain the view that Act No. 820 has a sufficiently definite meaning to enable the court to interpret and apply it.

Also, it seems to us that the use of the word "near" in amendatory Act No. 820 simply makes clearer what was already within the scope of the statute being amended, that is, the power to construct and lease buildings and improvements not only on wharves but adjacent thereto and within reasonable distances therefrom. Although the opinion in Radcliff refers to the facilities there involved as being located "upon" a pier, the character of those facilities (including a banana handling plant, a cold storage plant, and a grain elevator) indicates that they were not actually located on a pier proper, that is, "a structure built out into the water with piles for use as a landing place" (Webster's New International Dictionary, 2d Ed. 1951, p. 1859), and suggests that the words "upon such pier" in the opinion were intended to refer to the general location of those facilities as being adjacent to and perhaps partly on a pier. It seems clear that all of the facilities

involved in Lang could not have been actually located *on* a pier or a wharf.

There are authorities supporting a holding that the use of the word "near" in a statute does not thereby make the statute void for uncertainty. See: Kirkbride v. Lafayette County, Missouri, supra; Haughawout v. Percival, 161 Cal. 491, 119 P. 649; Benton County v. State Highway Commission, (Mo.) 52 S.W.2d 995; Verner v. Muller, 89 S.C. 117, 71 S.E. 654; City of Nashville v. Vaughn, 158 Tenn. 498, 14 S.W.2d 716; Ex parte Frye, 143 Tex.Cr.R. 9, 156 S.W.2d 531; Pedrick v. Raleigh & P. S. R. Co., supra.

The authority for the Department to enter into the project lease as lessee is derived from the legislation implementing the part of amended § 93, Constitution 1901, known as the Mobile Port Amendment (Amendment XII; carried forward in Amendment LVIII).

As originally adopted in 1901, § 93 prohibited the State from engaging in any "work of internal improvement." By subsequent amendments to § 93, the State has been authorized to engage in three different types of "work of internal improvement," viz.: (a) highway construction (Amendment I); (b) seaport promotion and development (Amendment XII, the "Mobile Port Amendment," supra); and (c) airport construction (Amendment LVIII, supra). The pertinent portion of § 93, as amended, is as follows:

> " * * * [W]hen authorized by appropriate laws passed by the legislature the state may * * * engage in the work of internal improvement, or promoting, developing, constructing, maintaining, and operating all harbors and seaports within the state or its jurisdiction * * *."

The enabling legislation under the quoted part of amended § 93 is contained in Chap. 1, Tit. 38, Code 1940, as supplemented and amended. Section 1, Tit. 38, using the same broad language as that contained in the "Mobile Port Amendment," authorizes the State, acting through the Department, to engage in " * * * works of internal improvement and of promoting, developing, constructing, maintaining, and operating all harbors and seaports * * *." In so providing, the legislature authorized the State to exercise the full powers permitted by the Mobile Port Amendment.

Section 13, Tit. 38, authorizes the State, acting through the Department, to

> " * * * [A]cquire, purchase, install, *lease,* construct, own, hold, maintain, equip, use, control and operate at seaports, wharves, piers, docks, quays, grain elevators, cotton compresses, warehouses and other water and rail terminals and other structures, and facilities needful for the convenient use of the same in the aid of commerce * * *."

Section 3 of Act No. 367, appvd. Sept. 7, 1955, Acts 1955, Vol. II, p. 887, is similar in substance to §§ 1 and 13, Tit. 38.

Our decisions have recognized the broad scope of the foregoing enabling legislation. For example, in Lang, we held that such legislation has conferred "broad powers" and a "wide latitude of discretion" on the Department. The trial court's decree in Lang, which we approved, states the legislative purpose in adopting said enabling legislation to be as follows:

> " 'The Legislature recognized that the State in the operation of marine terminals would have ever changing conditions, brought about by progress and competition of other ports. * * * They rightly knew that all types of equipment, such as railway engines, crane, fertilizer handling equipment, and special facilities for handling various classes of cargo and necessary to "promote" the use and development of the state-owned terminals, the State, through its appropriate agency, would have the power to acquire such equipment and facilities under a lease agreement with the owner thereof which, in this case, is the City of Mobile.' "

■ Argument is made that since the project consists, in part, of processing facilities, it is different in kind from the facilities specifically enumerated in § 13, Tit. 38; and, therefore, the ejusdem generis rule requires the exclusion of the project as a facility which the Department is authorized to acquire under § 13. We are unwilling to read into the authorizing statutes a restriction that a facility, otherwise embraced within the statutory language, must be excluded therefrom if it includes processing facilities of the character here involved. To read such a restriction into § 13, in the light of "ever changing conditions, brought about by progress and competition of other ports" (taken from Lang, quoted above), would not be consistent with the purpose of the legislation implementing the Port of Mobile amendment. The purpose of that legislation is indicated by the language of § 1, Tit. 38, which authorizes the State, acting through the Department, to engage in "promoting" and "developing" harbors and seaports.

Moreover, the fact that a grain elevator is specifically enumerated in § 13, as one of the facilities constituting "a water and rail terminal," indicates that processing facilities may form a part of a water and rail terminal, within the meaning of that section. A grain elevator is defined in Webster's New International Dictionary, 2d Ed., 1951, p. 831, as a "building for elevating, storing, discharging, and sometimes *processing* grain. (1 c. under elevator)" [Emphasis supplied.]

We hold that the project is embraced within the language "wharves, piers, docks, * * * warehouses and other water and rail terminals and other structures, and facilities needful for the convenient use of the same in the aid of commerce," in § 13, Tit. 38.

This brings us to a consideration of the question whether the "power to acquire, purchase, install, lease, * * * maintain, equip, use, control and operate * * * water and rail terminals and other structures," given by § 13, Tit. 38, is sufficient authorization for the Department to make the agreements on its part contained in the project lease.

■ The statutory power to acquire property by lease necessarily implies the power to make the covenants customarily made by a lessee. Such customary covenants include not only payment of rent but also additional obligations of repair, maintenance, improvements, restoration, and insurance, such as are provided for in the project lease. In Lang, covenants (on the part of the lessor) to maintain, operate and insure the leased facilities were deemed authorized by the bare power to lease. There seems no good reason why the same principle should not apply also to a lessee, since those are also obligations often assumed by lessees. Likewise, the power to agree to pay rent would seem necessarily to carry with it the power to limit to specified revenues, the source from which the rentals will be paid, and the power to specify the priorities with respect to payments from those revenues. Hence, we hold that the Department has the power to make the covenants and pledges contained in the project lease.

### 4. *The Employment Agreement.*

■ Section 6 of Act No. 103, appvd. June 30, 1955, Acts 1955, Vol. I, p. 345 (included in Recompiled Code 1958 as § 1(14), Tit. 38), authorizes the Director of the Department to "appoint such employees, attorneys and experts as may be necessary to perform all services needed in the management, operation, and control of the dock and terminal facilities" under the jurisdiction of the Department, and also to "appoint such architects and engineers and other persons as may be required for the study and development of the department's facilities." Obviously, the Director of the Department cannot personally perform all functions of managing and operating the port facilities. In order for the Department to operate, the Director necessarily will have to employ agents and employees of various kinds, including experts. The authority to do so is given by Act No. 103,

§ 6, supra. We hold, therefore, that the Department, acting through its Director, has statutory power to employ the persons, including a corporation rendering expert service, needed for the management, operation, study and development of the facilities of the Department.

### 5. *The Service Requirements Agreement.*

▆▆▆ The Department has statutory authority to make contracts with customers for services to be rendered by the Department in the exercise of its statutory powers. To be sure, it must be able to make such contracts in order to perform its functions. Clearly, it seems to us, the power to make such contracts is included in the general powers of the Department to manage and operate the state docks facilities, given by Chap. 1, Tit. 38, Code 1940, as amended and supplemented by Act No. 103, supra, and Act No. 367, appvd. Sept. 7, 1955, Acts 1955, Vol. II, p. 887. We hold that the service requirements agreement is within the scope of the Department's statutory powers.

### 6. *The Guaranty Agreement.*

Neither the City nor the Department is a party to the guaranty agreement; nor does the agreement impose obligations of any kind on either of them.

Having determined that there is authority in the language of the applicable statutes for each of the proposed actions on the part of the City and the Department, we proceed now to the constitutional questions.

## CONSTITUTIONAL QUESTIONS

### 1. *As to Violation of Amended Section 93, Constitution 1901.*

▆▆▆ It is contended that the project is not a work of internal improvement in the promotion and development of harbors and seaports, within the meaning of the provisions of the Mobile Port Amendment. The general language of that Amendment includes within its scope the facilities speci-fied in more detail in § 13, Tit. 38, supra. It follows that the project, which we have held to be included in the language of § 13, quoted above, is a work of internal improvement in promoting and developing harbors and seaports, within the meaning of the Mobile Port Amendment.

The broad scope of the Mobile Port Amendment has been recognized by this court. See: Radcliff and Lang, supra. In the latter case, we approved the following from the decree of the trial court:

"The Constitution and Enabling Acts authorize the State through a duly created agency, to engage in the work of 'promoting, developing, constructing, maintaining and operating all harbors and seaports within the State.' *No broader powers could have been concisely conferred. * * *"* [Emphasis supplied.]

▆▆▆ We do not think the employment agreement, by which the Department employs the operating company to perform services at a portion of the project, violates those provisions of § 93, Constitution 1901, as amended, having the effect of requiring that works of internal improvement acquired by the State at harbors and seaports shall remain under the management and control of the Department. By the express terms of the employment agreement, the Department has reserved "full management and control" of the plant facilities referred to in that agreement.

▆▆▆ The actions of the Department in entering into those of the proposed agreements to which it is a party will not violate the provisions of § 93, Constitution, 1901, as amended, prohibiting the State from being interested in any private or corporate enterprise or lending money or its credit to any individual, association or corporation. It seems clear that the Department is not lending its credit to the City under the project lease; but, even if so, such action would not violate § 93, as amended. That section does not apply to transactions between the Department and

the City. State ex rel. Austin v. City of Mobile, 248 Ala. 467, 28 So.2d 177; Alabama State Bridge Corporation v. Smith, 217 Ala. 311, 116 So. 695.

■ Since no contention is made that the services to be performed by the Operating Company will not be worth the compensation to be paid to it, we are not impressed with the argument that the employment agreement will constitute a lending of the State's credit.

The service requirements agreement is a business contract with benefits accruing to both parties. Under its provisions, Henderson, as a customer of the Department, has access to facilities to which it may submit its requirements of sugar for processing. The Department, in turn, receives from Henderson amounts sufficient to pay the cash rental required to be paid by the Department under the provisions of the project lease, and the costs of operation, maintenance and capital improvements to the plant facilities (other than those of such costs that are allocable to the processing of sugar for others than Henderson) and also to yield a profit to the Department. The payments made by Henderson under the service requirements agreement do not cover any services rendered to Henderson at the wharf facilities. It will, therefore, be necessary that Henderson make additional payments of wharfage and dockage fees with respect to sugar presented by Henderson for processing. The Department will receive benefits under the service requirements agreement, regardless of whether Henderson has any requirements for the processing of sugar.

■ When a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides, it is not a lending of credit by the public body. Otherwise, §§ 93 and 94, Constitution 1901, as amended, would prohibit any public body from entering into any contract whereunder the other party gained any benefits whatever. Presumably, benefits must accrue to the other party to every contract entered into by the Department for services from the port facilities at Mobile. Otherwise, it is not likely that anyone would enter into a contract with the Department.

■ In considering whether the actions of the Department in entering into the employment agreement and the service requirements agreement would constitute a lending of the State's credit to Henderson and its subsidiary, the Operating Company, we have not considered it important that two corporations, rather than one, are involved. Our conclusions would be the same if Henderson were the other party to both the employment agreement and the service requirements agreement.

What was said in State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283, and In re Opinion of the Justices, 237 Ala. 429, 187 So. 244, is not inconsistent with our conclusions in this case. The business activities involved in those cases were not within the exception clauses that were added to § 93 of the Constitution by the Mobile Port Amendment. The Wilkinson case involved the engaging by the State in the business of selling liquor, and In re Opinion of the Justices involved the operation by the State of agricultural produce markets. Neither of those cases involved the promotion or development of a seaport.

■ Activities of the State in promoting and developing seaports are given exceptional and special treatment by § 93, as amended by the Mobile Port Amendment. The customary functions of the Department constitute the carrying on of proprietary enterprises. In State Docks Commission v. Barnes, 225 Ala. 403, 143 So. 581, we spoke of the State in its port activities as being "engaged in business enterprises," and as "performing a business or corporate power, and not a governmental function." While the State is prohibited by § 93, as amended, from engaging in proprietary functions and business enterprises generally, we hold that it is not prohibited thereby from carrying

on business enterprises of the nature here involved in promoting and developing its seaports.

### 2. As to Violation of Section 94, Constitution 1901

The contention is made that the proposed actions of the City will constitute a lending of its credit to the Department in violation of § 94 of the Constitution. We have held that § 94 does not apply to a transaction between a municipality and an agency of the State. See: City of Andalusia v. Southeast Alabama Gas District, 261 Ala. 297, 74 So.2d 479; State ex rel. Austin v. City of Mobile, 248 Ala. 467, 28 So.2d 177, supra.

It is contended also that the proposed actions of the City would constitute a lending of the City's credit to the two private corporations, in violation of § 94. The argument is that the City's assistance to the Department enables the Department to acquire a leasehold in the project, and the Department's acquisition of that leasehold in turn makes it possible for the Department to enter into the service requirements agreement and the employment agreement, from which the two private corporations presumably will derive a benefit. We have held above that those two agreements do not constitute a lending of credit by the State. Since those agreements do not constitute a lending of credit by the Department to the two corporations, it follows that the City's aid to the Department cannot be considered a lending of the City's credit to the two corporations.

The provisions of the proposed agreements that make the City a third party beneficiary of the employment agreement and the service requirements agreement, and that prevent the Department from agreeing with the other parties to those agreements to terminate them, without the consent of the City, are for the protection and benefit of the City. They add nothing to the rights of either the Department or the other parties to the said agreements.

The cases of Garland v. Board of Revenue of Montgomery County, 87 Ala. 223, 6 So. 402 and Griffin v. Jeffers, 221 Ala. 649, 130 So. 190, involved the incurring of a pecuniary liability on the part of a county for the benefit of a private corporation. In the instant case, the actions of the City are for the benefit of the Department. Further, such actions do not involve the incurring of a pecuniary liability on the part of the City, since its obligations and the proposed agreements are expressly limited to revenues from the project and to moneys incidental thereto, such as bond and insurance proceeds. See: Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629; In re Opinion of the Justices, 256 Ala. 162, 53 So.2d 840; Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A.L.R. 1381.

The cases of State ex rel. Wilkinson v. Murphy, supra, and In re Opinion of the Justices, 237 Ala. 429, 187 So. 244, supra, are not in point on the question of whether the proposed actions of the City violate § 94. Those cases were decided under the clause of § 93 that (with certain exceptions) prohibits the State from engaging in "private or corporate enterprise." No corresponding provision is contained in § 94, which relates to municipalities and counties. That salient difference between §§ 93 and 94 (then §§ 54 and 55, Constitution 1875) was noted in Sheppard v. Dowling, 127 Ala. 1, 28 So. 791, 85 Am.St.Rep. 68, and is demonstrated by the fact that it was necessary to amend § 93 to enable the State to engage in the promotion and development of harbors and seaports, while statutory authority has been considered sufficient to empower a municipality to engage in business activities at seaports. Cf.: Radcliff, supra; State ex rel. Austin v. City of Mobile, supra.

The cases of Laney v. Jefferson County, 249 Ala. 612, 32 So.2d 542, and City of Bessemer v. Huey, 247 Ala. 12, 22 So.2d 325, are not to the contrary. Neither of those decisions involves or refers to § 94. In the Laney case, the "single inquiry" for decision was whether, in operating a hos-

pital, a county was engaged in a proprietary business or a governmental function. The decision in Bessemer v. Huey rested on a want of statutory authority.

### 3. As to Violation of Section 100, Constitution 1901

 There is no merit in the contention that the clauses of the project lease that limit the liability of the City to certain specific sources might violate the provisions of § 100, Constitution 1901, that no obligation or liability owned by the State shall be remitted, released, or postponed. The entering by a state agency into a contract involving a limited obligation on the part of the other party thereto is entirely different from releasing a liability that has already been incurred. Analogous are cases sustaining the validity of tax exemption statutes against attacks based on § 100 (In re Opinion of the Justices, 234 Ala. 358, 175 So. 690), and cases holding that § 100 does not prevent the State from being bound by statutes of limitation and non-claim (Covington County v. O'Neal, 239 Ala. 322, 195 So. 234; State v. Acacia Mutual Life Ass'n, 214 Ala. 631, 108 So. 759).

### 4. As to Violation of Sections 22 and 103, Constitution 1901

 The City's proposed actions are not prohibited by either of §§ 22 and 103, Constitution 1901. A lease made by a public body, pursuant to statutory authority does not constitute an irrevocable and exclusive grant of special privileges, within the meaning of § 22 of the Constitution. That section is designed to prohibit grants of special privileges where some derogation of or encroachment on public rights is inherent in the grant, and is directed at grants of monopoly and discriminatory privileges made by a legislative body in its sovereign capacity, and is not directed at contracts of a private nature such as leases. See: Town of Elba v. Rhodes, 142 Ala. 689, 38 So. 807; Dickinson v. Cunningham, 140 Ala. 527, 37 So. 345; Birmingham & Pratt Mines Street Railway Co. v. Birmingham Street Railway Co., 79 Ala. 465, 58 Am.St.Rep. 615. Sec-

tion 103 is merely a constitutional mandate to the legislature, which has been complied with by the passage of certain laws not here relevant. See: City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301.

### 5. As to Violation of Section 213, Constitution 1901

 The obligations of the Department under the project lease do not constitute a debt of the State within the meaning of § 213 of the Constitution. See: Lang, supra; In re Opinion of the Justices, 247 Ala. 663, 26 So.2d 103; In re Opinion of the Justices, 249 Ala. 180, 30 So.2d 715.

### 6. As to Violation of Section 222, Constitution 1901

 Issuance by the City of the proposed revenue bonds would not violate § 222, Constitution 1901. That section does not apply to bonds that are payable solely out of the revenues from a new project to be constructed with the proceeds from those bonds. See: Newberry v. City of Andalusia, 257 Ala. 49, 60, 57 So.2d 629; In re Opinion of the Justices, 252 Ala. 583, 42 So.2d 348; Randall v. State ex rel. City of Tuskagee, 233 Ala. 446, 172 So. 277.

### 7. As to Violation of §§ 1, 35 and 36, Constitution 1901

 The contentions that consummation of the plan would deprive individuals of the right to engage in business in violation of §§ 1, 35 and 36, Constitution 1901, and would constitute "usurpation and oppression," within the meaning of said § 35, are not well taken. It seems that those contentions could apply with equal force to every facility operated by the Department and to every proprietary enterprise acquired by a municipality under the Lee Act and similar statutes. The power of the Department to conduct proprietary enterprises at the Port of Mobile, and the power of municipalities to carry on proprietary functions, when authorized by statute, are well established. See: Authorities cited in our discussion, supra, of §§ 93 and 94, Con-

stitution 1901; also Birmingham Electric Company v. City of Bessemer, 237 Ala. 240, 186 So. 569, supra.

### Mutuality of Service Requirements Agreement

Contention is made that "the service requirements agreement is lacking in mutuality." The point is not well taken.

■ The service requirements agreement clearly has mutuality of consideration and, since the contract is executory on both sides, mutuality of obligation. It contains several agreements on the part of each of the parties thereto. The primary obligation of the Department is to process for Henderson at the plant facilities all sugar that Henderson submits for processing, not exceeding the capacity of the plant facilities. Henderson's principal obligations under the agreement are the obligation to present its requirements of sugar for processing at the plant facilities and the obligation to pay the Department substantial cash sums, including certain amounts that will be payable whether or not Henderson continues to have sugar processing requirements, and certain additional amounts measured by the quantity of sugar processed for Henderson. A binding contract arises from those obligations. See: Hill v. Rice, 259 Ala. 587, 67 So.2d 789; Sherrill v. Alabama Appliance Co., 240 Ala. 46, 191 So. 1; Alabama City G. & A. R. Co. v. Kyle, 202 Ala. 552, 81 So. 54; Evans v. Cincinnati, Selma & Mobile Railway Company, 78 Ala. 341.

### The City Becoming a Trustee

■ The contention is made that, by its actions in consummating the plan, the City will become a trustee of "private funds for private purposes."

The fact that the City might be deemed, in some aspects, to have obligations comparable to those of a trustee does not make invalid actions on its part that are authorized by statute and are not prohibited by any constitutional provision. In Chamberlain v. Board of Commissioners of the City of Mobile, 243 Ala. 662, 11 So.2d 724, we upheld the validity of a transaction in which we stated that the City was "virtually a trustee" of a fund derived from certain toll charges.

### Public Policy

■ There is no merit to the insistence that, irrespective of Section 94 or any other specific constitutional provision, the project is against public policy.

■ Except insofar as specifically limited by the Constitution of Alabama and the Constitution of the United States, the full legislative power of the State is vested in the Legislature. See: State ex rel. Wilkinson v. Murphy, supra; Newberry v. City of Andalusia, supra; Sheppard v. Dowling, supra. Except as inhibited by specific constitutional provisions, the Legislature has the power to determine and declare the public policy of the state and determine what is a lawful municipal purpose and a public purpose with respect to which a municipality may exercise powers. In Denson v. Alabama Fuel & Iron Co., 198 Ala. 383, 391, 73 So. 525, 529, this court said:

"* * * In order to ascertain the public policy of a state in respect to any matter, the acts of the legislative department should primarily be looked to, because a legislative act, if constitutional, declares in terms the policy of the state. * * *"

To like effect are Warren v. Alabama Farm Bureau Cotton Ass'n, 213 Ala. 61, 104 So. 264; State ex rel. Meyer v. Green, 154 Ala. 249, 46 So. 268.

From Powell v. City of Birmingham, 258 Ala. 159, 167, 61 So.2d 11, 18, is the following:

"* * * [I]t seems to be against public policy as established by the weight of authority for a municipality to hold rental property as an investment."

That comment is superfluous and unrelated to the holding in that case. If it means that public policy in this State is something "established by the weight of

authority" of the courts in this country, rather than by the Legislature of this State, it is in conflict with direct holdings on the point by this Court. See: Warren v. Alabama Farm Bureau Cotton Ass'n, supra; State ex rel. Meyer v. Green, supra; Denson v. Alabama Fuel & Iron Co., supra, and cases cited in those decisions.

If the comment means that there is a "public policy" which would prevent the Legislature from authorizing municipalities to lease property to others, or that would prevent municipalities from leasing property to others pursuant to statutory authorization, then the comment is contrary to direct holdings of this Court. See: Newberry v. City of Andalusia, supra; Radcliff, supra; Lang, supra; Corning v. Patton, 236 Ala. 354, 182 So. 39; In re Opinion of the Justices, 256 Ala. 162, 53 So.2d 840.

### Wisdom and Propriety of Plan

█ Argument seems directed at the wisdom, propriety and advisability of the plan embodied in the proposed agreements. In a long line of decisions, we have held that the wisdom, propriety, expediency and desirability of actions by public bodies are not matters for judicial review in the absence of an allegation of fraud, corruption, bad faith, abuse of discretion, or unfair dealing. We have held further that the corruption, bad faith, abuse of discretion, and unfair dealing that will justify judicial review are tantamount to and equivalent of fraud. See: Estes v. City of Gadsden, 266 Ala. 166, 94 So.2d 744; Terrell v. Marion County, 250 Ala. 235, 34 So.2d 160; State ex rel. Austin v. City of Mobile, 248 Ala. 467, 28 So.2d 117, supra; Gaines v. Harmon, 246 Ala. 307, 20 So.2d 503; Van Antwerp v. Board of Commissioners of the City of Mobile, 217 Ala. 201, 115 So. 239; Clements v. Commission of City of Birmingham, 215 Ala. 59, 109 So. 158; Pilcher v. City of Dothan, 207 Ala. 421, 93 So. 16. There is no allegation of fraud.

### Taxing the Costs

█ Many decisions of this court state the law here applicable. In Lucas v. Lucas, 258 Ala. 515, 64 So.2d 70, we said:

"The taxation of costs in equity proceedings is governed by Equity Rule 112, Code 1940, Title 7, Appendix, which, in pertinent part, is as follows:

" 'Costs will be imposed by the court or judge having jurisdiction at such times during the litigation as he deems proper, subject to correction for improper exercise of his discretion, and may be apportioned by him between the parties; * * *.'

"In referring to Equity Rule 112, supra, it was stated in Dozier v. Payne, 244 Ala. 476, 477, 14 So.2d 376, 377, as follows:

" 'This rule needs no elaboration. It follows the long established rule in equity vesting in the chancellor a discretion in the taxation of costs; but, says the rule, "subject to correction for improper exercise of his discretion." An "improper" exercise of discretion appears when the record, after indulging all fair intendments in favor of the ruling, discloses the taxation of costs was unjust and unfair. Otherwise the action of the trial court should not be disturbed.

\* \* \* \* \* \*'

"See, also, the later case of Thompson v. Bryant, 251 Ala. 566, 569, 38 So.2d 590, 593, wherein it is stated as follows:

" 'In equity the matter of costs rests largely in the discretion of the chancellor.' "

Considering the case before us in the light of the foregoing pronouncements, we are unwilling to say that there was an improper exercise of discretion by the trial court in the taxation of costs.

### Boyes' Petitions for Certiorari

█ Boyes filed, in connection with each of these appeals, a petition for certiorari to correct the record by adding thereto a statement dictated into the record of the hearing in the trial court by counsel for Boyes, in which he purports to quote

portions of an oral argument theretofore made in the trial court by one of the counsel for respondents. In reaching our conclusions stated above, we have considered the record as it is and have also considered the record as it would be if that statement and the argument to which it refers were added to the record. That addition, if made, would not affect this court's decision respecting the matters before it for decision. Those petitions should, therefore, be denied.

The motion to substitute as parties in place of the Director of the Department and the Mayor and President of the Board of Commissioners of the City, the respective successors in office of said parties, has been granted.

The decrees appealed from are affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.