This case arises out of the annexation of the Riverchase development into the City of Hoover, and the primary issue is whether a landowner had a right to tie-in to a trunk sewer line which ran through his property. The appellant, Richard Ramer, owner of a tract of land through which the sewer passed, contends that the trial court committed numerous errors in this case, but he asks this Court to consider only the most "glaring errors." Those errors are stated thusly:
 1. Does a sewer right-of-way deed, prepared by the grantee, which recites that the real property through which the right-of-way passes is benefited, create a right in the property of access to the sewer line, or, in the alternative, does a subsequent denial by the grantee of sewer access amount to a taking requiring the payment of just compensation?
 2. Should the annexation election incorporating Riverchase within the City of Hoover be annulled?
 3. Were the annexation agreements between the City of Hoover and Harbert-Equitable Joint Venture valid?
 4. Under the totality of circumstances in this case, has Ramer received due process and/or equal protection as required by the Fourteenth Amendment?
Ramer's 58-acre tract of property is located in Jefferson County. Ramer resides in the county, but he neither resides in nor votes as an elector in Hoover. He sued the City of Hoover, the Harbert-Equitable Joint Venture (HEJV), and the County Commissioners of Jefferson County, claiming that by their combined actions, they had blocked the development of his property. The trial court made extensive findings of fact. We incorporate pertinent portions, which we find are sustained by the evidence:
 "The Plaintiff, Ramer, is the owner of 58 undeveloped acres in the City of Hoover through which a County trunk line sewer runs within a right of way conveyed in 1958 by Ramer's predecessor in title. The sewer line now in use runs to the Cahaba River Treatment Plant of the County. The right of way deed contains language in the words of a release that the parties to the deed acknowledge that the sewer when constructed will be of benefit to the property of the grantor.
 "At the time Ramer acquired the property in January 1977, it was unimproved, undeveloped and not subdivided. It was zoned agricultural. All of the property was not in the City at the time of purchase and a portion of it was in the unincorporated area of the County.
 "Prior to the time Ramer became the owner of the property, the drainage area where the property is located, as is most if not all of southern Jefferson County, [was] subject to a sewer connection moratorium adopted by the Jefferson County Commission in February 1976. Suffice it to state here that the moratorium was imposed as a result of increased sewage demands and the inability of the existing treatment facilities to meet permit authorization of the Environmental Protection Agency of the Federal Government. See Peterson v. Jefferson County, 372 So.2d 839 (Ala.Sup.Ct. 1979). Ramer had notice of the moratorium, but was aware of the possibility of a partial lifting of it by Jefferson County at a subsequent date.
 "Within a day or so of his purchase of the property, Ramer inquired of obtaining a change of zoning to permit use of land for apartments from the City of Hoover but did not apply for a change of zoning nor meet the requirements of the City for rezoning until October 9, 1978, he having previously filed his annexation petition on July 3, 1978. The delay was occasioned by the necessity that Ramer seek and obtain the annexation to Hoover of the unincorporated portion of his property and completion of his development plans. Ramer's property was thereafter annexed by ordinance to Hoover and rezoned *Page 458 
by the Hoover City Council on November 6, 1978.
 "On March 22, 1977, the Jefferson County Commission adopted a so-called `lifting resolution' permitting limited additional sewer connections to the extent of approximately 800,000 gallons per day. This resolution authorized applications for sewer connection permits and provided that
 "`. . . all property to be served by the requested sewer connection must be properly zoned. . .'
 "Applications were authorized to be received until 5:00 P.M. on April 29, 1977.
 "At the time for applications under the lifting resolution, Ramer had owned the property for three months, had no development plans and had not sought to have Hoover annex his unincorporated land, nor met Hoover requirements for rezoning. The land was then zoned for agricultural use. It is uncertain whether Ramer had available approximately $80,000 required for obtaining sewer connection permits.
 "The Moratorium Committee established by the County Commission received 42 applications for sewer allocations under the lifting resolution, one of which was on behalf of the Harbert-Equitable Joint Venture (H-E Joint Venture). The total requests for allocations far exceeded the 800,000 gallon addition available and the Moratorium Committee apportioned the allocations among the applicants based upon their stated needs. The Riverchase development of Harbert-Equitable Joint Venture was allocated 300,000 gallons of sewer use. This allocation was in addition to a 100,000 gallon allocation previously granted Riverchase under the original moratorium in 1976.
 "In January 1979, Ramer sought from Jefferson County and the Moratorium Committee a sewer allocation. He made no formal application but appeared before the Committee. His request was denied as not being within one of the authorized exceptions and not having a prior allocation."
In 1974 HEJV started the Riverchase development. The planned community covers some 3,000 acres of land in Jefferson and Shelby Counties. The development includes commercial and residential construction. HEJV maintains that the scale of the project demands access to a large volume of water for sewage treatment capacity. HEJV asserts that the Jefferson County Commission in letters of commitment promised to provide adequate treatment capacity for Riverchase from the then existing Cahaba River Treatment Plant.
In 1979, HEJV began negotiations with the City of Hoover for the annexation of Riverchase into Hoover. An annexation agreement between HEJV and Hoover included the following provisions: (1) residents of Riverchase would be exempt from any increase in ad valorem taxes for 15 years; (2) workers in Riverchase would be exempt from any increase in occupational taxes for 15 years; (3) Hoover would purchase the Riverchase Plant from HEJV; and (4) Riverchase would have exclusive use of the Riverchase Plant. The administration of the City of Hoover ratified the agreement.
A proposed bill was introduced in the Alabama Legislature to annex Riverchase to Hoover. In its Opinion of the Justices,381 So.2d 632 (Ala. 1980), this Court questioned the adequacy of the legal notice given for the proposed legislation regarding the annexation and raised doubts about portions of the annexation agreement, specifically the tax exemption provisions. Another proposed bill was enacted into law (1980 Ala. Acts 590).
On September 9, 1980, Hoover conducted the Riverchase annexation election. A majority of the electors who voted did vote for annexation. Ramer argues that because: (1) the electors of Hoover did not vote in the election; (2) the Boards of Registrars for Jefferson and Shelby Counties allegedly failed to provide a list of qualified voters for the election; and (3) portions of the annexation agreement are invalid, that this Court must nullify the election. Ramer also questions the propriety of Hoover's *Page 459 
planned purchase and use of the Riverchase Plant.
In August 1979, Hoover adopted the Planned Unit Development (PUD) HEJV submitted to the municipality which altered the zoning ordinance of the City of Hoover. Ramer argues this plan exceeded the powers granted to Hoover by law.
Ramer commenced this action against the appellees to have the annexation election and various portions of the annexation agreement declared invalid. Ramer also sought to have the trial court order Jefferson County to make a sewage allocation to him for his 58 acres. The trial court, hearing evidence presentedore tenus, refused to invalidate the election or to require the county to allocate Ramer any sewage tonnage capacity. In its final judgment, the trial court held that the portions of the annexation agreement exempting Riverchase from ad valorem and occupational tax increases for fifteen years violated Alabama law.
Ramer appeals from the trial court's final judgment.
 I. THE DEED Does Ramer have an unequivocal right to tie into the sewer trunk line?
Ramer argues that the sewer right of way deed that his predecessor in title executed reserved a benefit for his property, "if and when" the county constructed a sewer line, to hook into the sewer trunk line. The pertinent language in the right of way deed reads:
 "For the consideration aforesaid, the undersigned do grant, bargain, sell and convey unto said county the right and privilege of a perpetual use of said lands for such public purpose, together with all rights and privileges necessary or convenient for the full use and enjoyment thereof, including the right of ingress to and egress from said strip and the right to cut and keep clear all trees, undergrowth, and other obstructions on the lands of the undersigned adjacent to said strip when deemed reasonably necessary for the avoidance of danger in and about said public use of said strip, and the right to prohibit the construction or maintenance of any improvement or obstruction (except fencing) on, over, across or upon said area herein conveyed.
 "In consideration of the benefit of the property of the undersigned by reason of the construction of said sewer, the undersigned hereby release Jefferson County, the State of Alabama, and/or the United States of America, and/or any of their agents from all damages present or prospective to the property of the undersigned arising or resulting from the construction, maintenance and repair of said sewer, and the undersigned do hereby admit and acknowledge that said sewer if and when constructed will be a benefit to the property of the undersigned." (Emphasis added.)
The trial court reviewed the deed and in its judgment stated:
 "Ramer's contention that the Court should order the Jefferson County Commission to issue him a sewer permit to serve from 318 to 400 apartment units is due to be denied.
 "The deed of Ramer's predecessor in title contains no commitment to a sewer allocation. This deed is a right of way deed dated October 25, 1968 from Ramer's predecessors in title to Jefferson County. It predates the sewer moratorium by sixteen years. It recites consideration of $979.00 (a rate of $1,000 per acre) for `the right and privilege of a perpetual use of said lands for such public purpose. . . .' In a separate paragraph of the deed, a release to Jefferson County is recited and in such paragraph is the wording,
 "`In consideration of the benefit of the property by reason of the construction of said sewer . . . and the undersigned do hereby admit and acknowledge that said sewer if and when constructed will be a benefit to the property of the undersigned.'
 "This [sic] above recited words do not constitute an agreement of Jefferson *Page 460 
County to permit a sewer connection at any time under any circumstances. At best, it is an implied agreement that the sewer will be available and of benefit to the property if constructed. The deed expression, however, did not and could not anticipate that a subsequent intervening circumstance could make the sewer unavailable to a great number of property owners in Southern Jefferson County including the owner of Ramer's property. Based upon these matters, the Court concludes that the deed to Ramer's predecessor in title does not grant to Ramer the unequivocal right to connect to the sewer trunk line through his property at any time he desires.
 "Aside from the question whether the deed is a contract to obligate Jefferson County to provide Ramer, as the present owner sewer usage, the imposition of the sewer moratorium is a valid exercise of police powers by Jefferson County. Peterson v. Jefferson County, supra.
 "The evidence shows Ramer to be an experienced and knowledgeable developer. He knew the `lifting resolution' was possible, but he did not seek a sewer allocation until January 1979. There is no evidence that he did not know of the March 22, 1977 `lifting resolution' and it is unlikely that such was the case. The simple facts are that, taking into consideration the sewage emergency and conditions existing in Jefferson County at the time Ramer purchased his property, there was insufficient time for him to obtain the required zoning of his property and create development plans in time for the fortunate circumstances that permitted the moratorium to be partially lifted in March 1977. And, without question, Ramer had knowledge of the moratorium at the time he purchased the property.
 "Ramer has not, as claimed, been denied due process. The sufficiency of the due process procedure of the Moratorium Commission has twice been confirmed. Peterson v. Jefferson County, supra; Custred v. Jefferson County, 360 So.2d 285
(Ala.Sup.Ct. 1978). Notwithstanding these decisions, the evidence shows that the procedures and hearing afforded by the moratorium and the Moratorium Commission met the tests of due process. Katy [Katz] v. Alabama State Bd. of Medical Examiners, 351 So.2d 890 (Note 6) (Ala.Sup.Ct. 1977). There is no `taking' involved here. Ramer has his property and, assuming regulatory requirements to have been met, could have developed his property with an on site sewage disposal system that had been approved. His use of public sewage facilities is stopped now by a temporary limitation."
After reviewing the entire deed, we agree with the trial judge that Jefferson County was not under a legal obligation to provide the grantor a "sewer connection at any time, under any circumstances."
Regarding Ramer's argument that the County's actions constitute a taking of his property without just compensation in violation of the Fifth Amendment to the United States Constitution, the County, in brief, has directed the Court's attention to recently decided federal cases which address the issue of whether a governmental moratorium on sewage allocation constitutes a taking of property without just compensation. InKent Island Joint Venture v. Smith, 452 F. Supp. 455 (D.Md. 1978), a landowner-developer brought suit against local officials for blocking his development plans. The landowner alleged in part that the defendants misrepresented the effects of certain proposed amendments to the county sewage plan. In addressing the land developer's claim that the defendants were taking his property without just compensation, the Court held:
 "One of the constitutional violations claimed by plaintiff here is the alleged taking of its property without just compensation.
"* * *
 "This Court is satisfied that the acts alleged do not constitute a `taking' within the alleged constitutional sense which would permit claims to be asserted in this suit against these defendants. *Page 461 
 "Although governmental interference by regulation of the use of private property can constitute a de facto or constructive taking, there is no taking in the constitutional sense unless the interference is so substantial as to render the property worthless or useless. Steel Hill Development, Inc. v. Town of Sanbornton, 469 F.2d 956, 963 (1st Cir. 1972); Smoke Rise, Inc. v. Washington Suburban San. Com'n, 400 F. Supp. 1369, 1382 (D.Md. 1975). It is not enough that the regulation deprives the property owner of the most profitable use of the property, United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, [1104] 2 L.Ed.2d 1228 (1958), or that the regulation causes a severe decline in the property's value. Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, [990] 8 L.Ed.2d 130
(1962). In Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915), a decline in value from $800,000 to $60,000 was found by the Supreme Court to be insufficient to constitute a taking. Before a court can conclude that there has been an unconstitutional taking of property, the government regulation must deprive the landowner of all reasonable uses of his land. C.F. Lytle Co. v. Clark, 491 F.2d 834, 838 (10th Cir. 1974); see Donohoe Const. Co. v. Maryland National C.P. P. Com'n, 567 F.2d 603, 608 n. 13 (4th Cir. 1977).
 "Plaintiff has done no more than allege that the actions of the defendants have deprived it of the `most reasonable' use of its property and have resulted in `substantial decrease' in the property's value. These allegations are clearly insufficient to establish a taking in the constitutional sense. Goldblatt v. Town of Hempstead, supra; United States v. Central Eureka Mining Co., supra; Steel Hill Development, Inc. v. Town of Sanbornton, supra."
452 F. Supp. at 460.
 II. ANNEXATION ELECTION
Ramer argues this Court should declare the annexation election a nullity. In support of his position, he sets forth three reasons: (1) the electors in Hoover did not participate in the election; (2) the Boards of Registrars of Jefferson and Shelby Counties allegedly failed to provide election officials with a list of qualified voters; and (3) material contractual commitments between HEJV and Hoover to induce a favorable annexation vote are void and unenforceable.
At trial, the appellees asserted that Ramer did not have standing to contest the annexation election, but the trial judge in his order held: "Ramer, though not a Hoover elector, is a property owner and taxpayer of Hoover. As a taxpayer, he has a right to protect and the totality of his annexation claims assert a misuse of corporate power. The Court thus holds that Ramer has standing to assert these issues. . . ."
After consideration of the standing issue, we hold that the trial judge correctly found that Ramer had standing to contest the annexation election; therefore, we will address the contentions Ramer makes regarding the annexation election, viz: (1) the Boards of Registrars of Jefferson and Shelby Counties failed to furnish a proper list of the qualified electors in the area to be annexed, and (2) when two crucial provisions of the annexation agreement between HEJV and Hoover, which were inducements to vote for annexation, were declared invalid by the court, then the favorable vote for annexation should not be effective and binding. The trial court, in a lengthy decree, addressed these issues as follows:
 "Ramer's contention that Act No. 80-590 is void because of a variance between the published notice of the proposed local act and the act as adopted into law is rejected.
 "Section 106 as amended by Amendment No. 341 of the Alabama Constitution 1901 provides that no local law shall be passed unless notice of intention to apply to the Legislature for passage of such law shall have been published, which notice shall state the substance of the proposed law.
 "The substance of the proposed legislative act as advertised cannot be materially *Page 462 changed or contradicted. State ex rel. Wilkinson v. Allen, 219 Ala. 590, 123 So. 36 (1929). In the case of the bill here, it was published in detail and such details cannot be materially changed throughout the legislative process to final passage and approval. Wilkinson, supra. The proposed act was published both in Shelby and Jefferson Counties. In the publications setting forth a legal description of the territory involved, the description ran over eight printed pages in length and described the boundary of lands of approximately 3,000 acres. One metes and bounds call was published as `665 feet' while the same call in the adopted act was `655 feet.' There was no evidence that the variance was material in any respect or that the land described in the adopted act cannot be ascertained. For such reasons, the Court rejects this contention.
 "Ramer contends that the annexation is void because the Hoover voters did not participate in the election. In Opinion of the Justices, 381 So.2d 632
(1980) cited by Ramer, the Supreme Court of Alabama rendered its advisory opinion to the Legislature regarding an earlier version of the Riverchase annexation bill. Except for the identical territory involved and the referendum requirement of that bill, the adopted act (80-590) bears no similarity to the earlier bill. There, the Supreme Court rendered its opinion that the offered bill violated Section 106 of the Alabama Constitution in respect to failures of the published notice. Those defects are not material here. The Court, however, in In Opinion of the Justices suggested that,
 "`Annexing and annexed citizens clearly share general concerns with the governance and welfare of the area. Given the similar interests of the two areas (the existing city and the territory to be annexed), disfranchising either seems improper.'
"The Court thus noted that,
 "`The residents of both areas have an interest; therefore, both must be notified.'
 "This Court does not deem these pronouncements mandate a ruling or even a suggestion that the voters in Hoover must also vote in the Riverchase annexation election. The Supreme Court was speaking in the context of the lack of published notice of the bill before it in respect to annexation agreements incorporated by reference only in the legislative bill. The notice did not include those agreements and the bill was clearly constitutionally defective for such reasons.
 "The notice preceding the adoption of Act 80-590 did not contain the same defects. The sponsors of Act 80-590 obviously `went to school' on the Supreme Court opinion and corrected the opined problems."
The trial judge correctly held that the advisory opinion of this Court, Opinion of the Justices, 381 So.2d 632 (Ala. 1980), only addressed the question of the adequacy of notice to the electors of the annexing and the annexed territory. Even though this Court did quote a Harvard Law Review article in that advisory opinion which suggests that electors in both the annexing municipality and the proposed annexed area should vote, the law of this state is that the Legislature, in the exercise of its sovereign power, can alter the territorial limits of a municipality without the approval of the municipality's electors. City of Birmingham v. Norton, 255 Ala. 262, 50 So.2d 754 (1950).
Ramer argues that the Boards of Registrars of Shelby and Jefferson Counties failed to provide the Hoover city clerk with "a list of qualified electors in the area to be annexed," and thus failed to comply with 1980 Ala. Acts 590. The trial judge, in his final judgment, found and concluded, as follows:
 "In brief, Ramer asks rhetorically, `Did the failure of the Boards of Registrars of Jefferson and Shelby Counties to furnish a list of qualified electors . . . vitiate the election? No evidence is cited or referred to that such facts were proven.
"Section 2 of Act 80-590 provides, *Page 463 
 "`The Boards of Registrars of Jefferson and Shelby Counties shall furnish to the City Clerk of the City of Hoover the names of those electors qualified to vote in this election . . .'
 "The evidence shows that each of the registrars involved furnished to the Hoover City Clerk a voters list. The list provided by the Jefferson County Board of Registrars may have included some voters not within the area to be annexed but no evidence has been presented as to this circumstance. Moreover, there has been no evidence presented that any ineligible voter voted in the annexation election. Assuming such to be the case, there has been no evidence that such votes would have altered the outcome of the election. The contention of Ramer regarding the voter list is denied."
We hold that the trial judge was justified in concluding that the lists the registrars provided sufficiently complied with the requirements of the annexation statute.
 III. THE ANNEXATION AGREEMENTS
The trial judge, finding Ramer had standing to challenge the Annexation Agreement, declared two provisions of the Annexation Agreement void.
The trial judge addressed the agreement, as follows:
 "Ramer next contends that the preelection agreement between Harbert-Equitable Joint Venture and Hoover constituted an illegal inducement to the Riverchase electors to consent to the annexation and that such agreement is illegal.
 "The agreement involved was executed by the Joint Venture and the Mayor of Hoover and dated November 1, 1979. At this time, the joint venture was characterized as the developer of a planned development and the agreement contemplated the introduction of a legislative bill authorizing the annexation of Riverchase (a planned development). It is a comprehensive document dealing with the subjects outlined below with a severability clause.
"The Agreement
 "1. The city will seek the enactment of a legislative bill to annex Riverchase subject to approval by referendum.
 "2. That the Planned Development plan of the developers in the process of construction and implementation will receive a Planned Unit Development (PUD) zoning classification under the City zoning ordinances upon annexation.
 "3. That the City will purchase at a cost not to exceed 3.5 million dollars the sanitary sewage disposal plant then under construction by the developer and thereafter agree to operate and maintain it. Further, that the initial capacity of the plant of 1.5 million gallons per day would be solely reserved for the Riverchase area and that an agreed upon sewer service charge tap fee and sewage treatment charge would be paid the City by the owners of the lots served, subject to the provision that if sales tax revenues of the annexed area do not produce at least $1.5 million dollars per year the rate limitation or sewage treatment charges will not be applicable. The developer further agreed to share one half of any deficits of the sewage treatment plant during the term of bonds to be issued by the City to pay for the plant costs. The parties agreed to arbitrate factual disputes as to proposed sewer maintenance necessity. All parts of the sewer agreement to be made the subject of the ordinance of the city.
 "4. That the annexed area would be exempt from increases in ad valorem tax increases for a period of fifteen years and the imposition of any new or additional occupational taxes for a like period of time. City sales taxes were exempted from the limitations of the agreement.
"5. The agreement contains a severability clause.
 "The evidence does not support Ramer's contentions that the agreement between Hoover and the joint venture constituted an illegal inducement to the Riverchase electors unless the agreement itself *Page 464 
is illegal. Ramer makes this latter contention as well.
 "Ramer contends and argues that the agreement unlawfully binds future governing bodies of Hoover and constitutes an unlawful delegation or abdication of police and legislative powers. He argues this to be so in respect to certain aspects of the agreement relating to planning and subdivision standards, use of the sewage plant by property only in Riverchase, specifications of the sewage plant to be purchased, repair and maintenance of the sewage plant by Hoover and expense sharing, and exemption from increased ad valorem taxes.
 "The agreement provides that planning and engineering standards of Riverchase shall supersede inconsistent ordinances or regulations of Hoover and more stringent City standards will not be applied unless the standards are mutually agreed upon. (Sections 3, 12 (b), Agreement). It is also provided in the Agreement that Riverchase would be exempt from increases in ad valorem taxes and new occupational taxes for fifteen years. (Section 14, Agreement)."
The trial judge concluded that "the tax exemption aspect of the agreement is void to the extent that it exceeds the authority granted by Act No. 787, 1977." The trial court addressed the tax exemption issue, as follows:
 "In respect to the taxation issue, Hoover argues that Act No. 787 of the 1977 Legislature of Alabama permits such exemption by authorizing a tax exemption for annexed territory for not less than ten years nor more than fifteen years of territories annexed to municipalities having a population of 600,000 or more according to the 1970 or any subsequent federal decennial census. This Court judicially knows that Hoover's population according to the 1980 federal decennial census effective April 1, 1980 was 19,792 and that Hoover is in a county having a population of 600,000 or more. Pickens County v. Jordan, 239 Ala. 589, 196 So. 121 (1940). The Act, as contended, does apply to Hoover. The Agreement, however, overreaches and exceeds that statutorily authorized exemption in Act No. 787.
"Section 2 of the Act provides that,
 "`All territory brought within the corporate limits of a city to which this act applies . . . may be exempt from city taxation or the payment of taxes to the city for the period of not less than ten nor more than fifteen years from the time when such territory is brought within the corporate limits of the city.'
"Section 3 of the Act provides, however, that,
 "From time to time after the lapse of five years from the time such territory is brought within the corporate limits of the city, all portions of such territory as has residing on it a population of at least twenty persons on a contiguous ten acres of land . . . shall thereafter be subject to taxation by the city and taxes shall be paid to the city.'
 "The Act also provides for an agreement by resolution setting forth the minimum level of services which will be provided the annexed territory for a period not to exceed five years.
 "No other authority has been cited to the Court to support Hoover's agreement to exempt the Riverchase area from ad valorem tax increases and new occupational taxes for a period of fifteen years and the Court's research has failed to reveal such authority. Act No. 787, 1977, fails to provide the authority for Hoover to exempt tax increases in the Riverchase area for more than five years. As stated, the Agreement exceeds this authority. For such reasons, the Court concludes that the tax exemption aspect of the Agreement is void to the extent that it exceeds the authority granted by Act No. 787, 1977."
It should be noted that the Act No. 787, 1977 Ala. Acts, would allow a total exemption for a period of five years from city ad valorem and occupational taxes, while the annexation agreement only exempted the *Page 465 
property owners of the annexed Riverchase area from "increases
in the rate of ad valorem taxation in effect on the effective date of such annexation for the period of fifteen (15) years from such date" and "the imposition of any new or additional
occupational taxes during such fifteen (15) year period. . . ." (Emphasis added.)
Ramer contends that the tax exemption portion of the agreement was an inducement to obtain favorable votes for annexation, and when the trial court voided these provisions insofar as they exceeded the authority granted by Act 787, 1977, that there was a "failure of consideration" and that the annexation election should have been declared invalid.
We disagree. Prior to annexation, property owners within the Riverchase area were not subject to any municipal taxes. Additionally, the evidence showed that there had been no increases in taxes since the date of the annexation election, and the evidence further showed that all property owners within the annexed area were paying the same rate of city taxes as were being paid by property owners similarly situated in other areas of the city. Furthermore, Act No. 787 would have authorized the City of Hoover to grant property owners a fullexemption for five years.
While we recognize that the exemption from new taxes constituted an inducement for property owners to vote favorably for annexation, City of Mobile v. Salter, 287 Ala. 660,255 So.2d 5 (1971), we cannot say that the trial court erred in refusing to invalidate the entire agreement and the annexation election because a portion of this inducement was held to be beyond the authority of the city to grant. The City of Hoover was authorized by Act No. 787 and under the authority of theCity of Mobile decision to grant tax exemptions for the annexed territory for a period of time, and the exemptions actually made by the city were considerably less favorable to the annexed area than otherwise could have been granted under the full tax exemption allowed under the statute. In view of all these circumstances, therefore, we hold that the trial court did not err by refusing to find a "failure of consideration" which would void the entire agreement and the election.
Regarding Ramer's argument that the annexation agreement provided that planning and engineering standards of Riverchase would supersede inconsistent ordinances and regulations of the city of Hoover, the trial judge held:
 "Notwithstanding the fact that the Agreement provides that the planning and engineering standards of Riverchase shall supersede inconsistent ordinances or regulations of Hoover unless mutually agreed upon, the evidence has failed to show that there exist any ordinances or regulations of Hoover that are superseded. This appears to be an empty agreement and presents no controversy to adjudicate. For such reason, the Plaintiff's contentions in this regard are denied."
It has been held that a person who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he would personally benefit in a tangible way from the court's intervention. Warth v. Seldin, 422 U.S. 490, at 508,95 S.Ct. 2197, at 2210, 45 L.Ed.2d 343. The court, although allowing Ramer to present evidence, nevertheless found as above-quoted, that "the evidence has failed to show that there exists any ordinance or regulations of Hoover that are superseded. This appears to be an empty agreement and presents no controversy to adjudicate."
Ramer has failed, on appeal, to cite any ordinance or regulations of Hoover that the annexation agreement supersedes. He does correctly cite authority which prohibits a municipality from relinquishing certain legislative powers. See City ofLeeds v. Town of Moody, 294 Ala. 496, 319 So.2d 242 (1975). The evidence does show that the City of Hoover passed ordinance No. 321 which adopted the Planned Unit Development (PUD) HEJV submitted for Riverchase, and when Hoover enacted the PUD, the planning and engineering standards *Page 466 
HEJV drafted for Riverchase became part of the zoning code for Hoover, but we find evidence to support the trial court's finding that Hoover never relinquished any legislative duties. The trial court was authorized to find that Hoover exercised its legislative powers and adopted the planning and engineering standards set forth in the annexation agreement. While Ramer has made various accusations about the motives of Hoover when it accepted the annexation agreement, he has failed to produce enough evidence to convince this Court that the trial court's findings were palpably wrong or unjust.
The appellant's final challenge to the annexation agreement regards Hoover's purchase of the Riverchase plant from HEJV. Ramer contends that the annexation agreement illegally gives the residents of Riverchase exclusive use of the Riverchase plant and, thereby violates Section 22, Constitution of Alabama, which prohibits making "exclusive grants of special privileges or immunityes." He also contends that the purchase violates Section 94 of the Constitution of Alabama, which prohibits any municipality from lending its "credit or to grant public monies * * * to any individual, firm, association or corporation whatsoever." Alabama Constitution, Art. I, § 22, provides:
 "That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
Ramer contends that Hoover's agreeing to allow residents of Riverchase exclusive use of the Riverchase plant equates to "exclusive grants of special privileges or immunities." The trial court correctly answered Ramer's arguments regarding Ala.Const., Art. I, § 22, when it held:
 "At the time of the Agreement, the Joint Venture had let contracts for the construction of the sewage disposal plant. The Agreement provided that, in the event the annexation was approved, the City would purchase, finance, construct, operate and maintain the plant to serve the portions of the Riverchase area south of the Cahaba River. The evidence shows this area to be the natural drainage basin of the area to be served. By the date of annexation, the plant had been substantially completed.
 "The City clearly has the authority to purchase, to contract for the construction, operate, maintain and incur debt for and in connection with sanitary sewer systems. Sections 11-47-3 (a), 11-48-4, 11-50-50, 11-50-71, Code of Alabama 1975.
 "The beneficiaries of the exclusive feature of the sewer contract are the present and future owners of the lots, parcels and lands to be served by the sewage plant. It will incidentally benefit the Joint Venture to the extent that it also is apparently still the owner of some of the lands in the area.
 "The issue then is whether the owners of the properties served is a reasonable classification and whether the contract is for the convenience of the public and benefit of the public. Franklin Solid Waste Services, Inc., et al. v. Jones, et al., 354 So.2d 4 (Ala. 1978); Crabtree v. City of Birmingham, 292 Ala. 684, 299 So.2d 282 (1974). There is no question but that public sanitary sewage facilities are for the convenience and benefit of the public. The evidence, further, has failed to show that any property in the drainage area served by the plant will not be so served. This is particularly the circumstance of the Plaintiff. His property is located in a different drainage area. This contract, in the Court's opinion, does not violate Section 22."
The trial court also correctly addressed Ramer's arguments regarding the purchase of the Riverchase plant and any possible violation of Ala. Const., Art. IV, § 94. That section of the Constitution provides:
 "The legislature shall not have power to authorize any county, city, town, or *Page 467 
other subdivision of this state to lend its credit, or to grant public money or thing of value in aid of, or to any individual, association, or corporation whatsoever, or to become a stockholder in any such corporation, association, or company, by issuing bonds or otherwise."
The trial court correctly relied on Rogers v. City of Mobile,277 Ala. 261, 268, 169 So.2d 282 (1964), and found:
 "When a contract of a public body is an ordinary commercial contract, with benefits flowing to both parties and a consideration on both sides, it is not a lending of credit by the public body. Otherwise, §§ 93 and 94, Constitution 1901, as amended, would prohibit any public body from entering into any contract whereunder the other party gained any benefits whatever."
In this instance, Hoover's proposed purchase of the Riverchase plant from HEJV is "an ordinary commercial contract" that does not violate Ala. Const., Art. IV, § 94.
Further, Ramer contends that any purchase of the Riverchase plant must be assessed to the residents of Riverchase that actually have use of the facility and cannot come from monies in the general fund of the City of Hoover. He relies on §11-50-71, Code 1975, which provides:
 "All cities and towns in this state shall have authority to purchase sanitary sewers or sanitary sewer systems already constructed and draining territory within their corporate limits, although the trunk sewers and disposal plants thereof may be located outside their corporate limits, and to cause the purchase price of said sewers or sewer systems with the disposal plants, together with the cost of improvements made thereon, to be assessed against the property abutting on the streets, avenues, alleys, highways or other public places so improved or drained by said sewers or sewer systems to the extent of the increase of the value of such property by reason of the special benefits derived from such sewers or sewer systems and from the purchase of the same by the municipality."
When read with other statutes authorizing the construction, maintenance and purchase of sewage facilities, it becomes clear that § 11-50-71 provides one alternative to finance the purchase of sewer plants. Code 1975, § 11-50-78, provides that the municipal councils may purchase a sewage plant "out of the general funds of the city. . . ." The trial court's judgment correctly held that Code 1975, §§ 11-47-3 (a), 11-48-4,11-50-50, and 11-50-71, grant the City of Hoover the power to "purchase, to contract for the construction, operate, maintain and incur debt for and in connection with sanitary sewer systems." No grounds are presented on appeal which require that this Court declare Hoover's proposed purchase of the Riverchase plant illegal.
 DUE PROCESS AND EQUAL PROTECTION
Ramer finally argues that the "totality of circumstances" in this case compound to deny him due process and equal protection guaranteed in the United States Constitution, Amendment XIV. Basically, he contends that the appellee's treatment of him while he was attempting to secure a sewage allocation has violated notions of "fundamental fairness." In part, Ramer questions the propriety of an attorney that represented the Jefferson County Commission and who also served as a member of the Moratorium Committee, which denied Ramer's request for a sewage allocation. Ramer made no objection to the attorney's membership on the Moratorium Committee when he took his allocation request before the committee or during the lower court trial. Therefore, this issue cannot now be raised on appeal. McDuffie v. Hooper, 294 Ala. 293, 315 So.2d 573 (Ala. 1975).
Ramer contends that the appellees' combined actions constitute an unlawful "taking" of his property. He claims that the decision of the Jefferson County Commission to allot HEJV a large percentage of the available sewage allocation is arbitrary and capricious. Further, he argues that the appellants negotiated "sweetheart deals" that afforded HEJV special treatment and, *Page 468 
therefore, violated his equal protection rights.
We have reviewed the vast record in the case and examined Ramer's argument and the appellees' rebuttal. We turn again to the learned trial court's final judgment where he made this statement about the final issue Ramer raises on appeal:
 "Ramer has not, as claimed, been denied due process. The sufficiency of the due process procedure of the Moratorium Commission has twice been confirmed. Peterson v. Jefferson County, supra, Custred v. Jefferson County, 360 So.2d 285 (Ala. 1978). Notwithstanding these decisions, the evidence shows that the procedures and hearing afforded by the moratorium and the Moratorium Commission met the tests of due process. Katy [Katz] v. Alabama State Bd. of Medical Examiners, 351 So.2d 890 (Note 6), (Ala. 1977). There is no `taking' involved here. Ramer has his property and, assuming regulatory requirements to have been met, could have developed his property with an on site sewage disposal system that had been approved. His use of public sewage facilities is stopped now by a temporary limitation.
 "Ramer's equal protection of the law claim and contention is also due to be denied. The Jefferson County moratorium applied to all sewer connections but with certain exceptions to protect property owners who had incurred substantial obligations in reliance on their ability to connect to the public sewer, i.e., possession of a valid building permit; property already improved for construction which contains lots not yet built upon but which already have the individual sewers installed and ready for service; existing septic tank systems which have been declared by the Health Department to be a health hazard. There has been no evidence that these exceptions are unreasonable or arbitrary. It is clear that Ramer was not singled out but, instead, was among a class of persons who did not fall within one of the exceptions.
 "The equal protection clause does not deprive government of its police powers to pass statutes for the protection of public health, safety, morals and for the general welfare. In such matters, the legislative body has wide discretion as long as the acts have an equal and uniform application to all persons similarly situated. When the act does not apply equally and uniformly to all who are similarly situated or there is no reasonable basis for the classification, it is in violation of the Fourteenth Amendment to the Federal Constitution. Hale v. State, 217 Ala. 403, 116 So. 369; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369.
 "Ramer's burden is to show that he fits within the classification or that the classification is arbitrary. He has done neither. In the same regard, Ramer has failed to show a denial of equal protection in respect to the Riverchase allocation. The parties were and are in different positions and classifications. Pretermitting Ramer's standing under the facts here to challenge Riverchase's allocation (Ramer was not eligible for a sewage allocation whether Riverchase was eligible or not), there has been no substantial evidence presented that Riverchase was not within the exceptions of the moratorium."
 CONCLUSION
The trial was lengthy, and the issues were varied and complex, but the trial was presided over by a learned trial judge, and we could have substantially adopted his extensive findings of fact and conclusions of law as our own.
For the reasons stated, the trial court's judgment is due to be affirmed.
AFFIRMED.
JONES, ALMON, SHORES and BEATTY, JJ., concur. *Page 469