Section 94 of the Constitution of Alabama of 1901, as amended by Amendment No. 112, prohibits a municipality from lending its credit or granting "public money or thing of value" in aid of, or to, any individual or private corporation. In Garland v. Board of Revenue ofMontgomery County, 87 Ala. 223, 6 So. 402 (1889), this Court expounded upon the scope and historical underpinnings of this prohibition:
 "[T]o comprehend the scope of [§ 94], . . . the causes in which it originated, and the mischiefs designed to be remedied, may be properly and helpfully considered. Under the constitutions preceding the present, the legislature had unlimited power over the subject. Several of the counties had, by legislative authority, subscribed for stock in railroad corporations, and issued bonds to pay for the same, in anticipation of their future public benefit. The disastrous consequences which ensued are common knowledge. Either from mismanagement or fraud, insolvency of the companies, and failure to complete the roads, supervened, the stock became worthless, and the indebtedness exceeded the ability of the counties to pay. Expensive and protracted litigation was inaugurated, taxation became oppressive; legal proceedings to compel the levy of taxes were prosecuted . . .; confiscation of the property of the citizens was impending, and the counties reduced to such condition as to be designated `the Strangulated Counties.' To prevent a recurrence . . ., [§ 94] was introduced. Its terms are comprehensive enough to include any aid, by issuing bonds or otherwise, by which a pecuniary liability is incurred, furnished by the municipalities named to private enterprises. . . . A loan of credit, or grant of money or thing of value, in aid of an individual or corporation, in any mode, directly or indirectly, *Page 755 
 falls within its operation. A direct loan or grant to the individual or corporation is not essential."
87 Ala. at 225-26, 6 So. at 402-03. Clearly, § 94 was designed to prevent an expenditure of public funds (1) that creates a pecuniary liability of the municipality, and (2) that is primarily designed to aid private individuals or corporations. See Mobile Wrecker Owners Ass'n,Inc. v. City of Mobile, 461 So.2d 1303, 1306 (Ala. 1984).
Here, the City clearly has incurred a pecuniary liability; thus, the pertinent inquiry is whether the expenditure of the public funds is for a public purpose or is to, or in aid of, a private individual or corporation. The public purpose must be significant and direct. "The paramount test should be whether the expenditure confers a direct public benefit of a reasonably general character, that is to say, to a significant part of the public, as distinguished from a remote and theoretical benefit." Opinion of the Justices No. 269, 384 So.2d 1051,1053 (Ala. 1980).
The undisputed evidence is as follows: For approximately $5,700,000, AIG proposes to transfer to the City approximately 19 acres of land. However, the land is severely encumbered because the Development Agreement between AIG and the City provides that the City "shall not have the ability to make changes or improvement of any kind to the Public Land unless the same are first approved by [AIG] and by any tenant of the Project having approval rights with respect thereto." AIG retains those veto rights until December 31, 2099 — almost 100 years. The Agreement also provides that AIG will make payments in lieu of the property taxes on the land, despite the City's titular ownership: "Developer and the City shall cause the Public Land to be appraised and the amount of tax calculated as though the Public Land were subject to tax. . . . Developer shall make . . . payments in lieu of taxes in an amount which is equal to the taxes that would have been payable on the Public Land if it were the owner of the Public Land." Additionally, the Agreement provides that "[AIG] shall remain the responsible party for maintenance of the Public Land."
In other words, the City will own the land, but it will have virtually no independent rights to or obligations in respect of the land for approximately 100 years. Conversely, AIG will develop and maintain the land, will, in effect, pay property taxes due and owing for the land as though it were the owner, and will possess veto power over any uses the City proposes for the land. In short, the Agreement appears to be designed to circumvent § 94's proscription against a municipality's lending private aid.
Furthermore, because of its location, the property is not suited for public use of a general character.
 "[The] property is surrounded on the east and south side by a subdivision . . .[;] part of the property . . . is wetlands that you can't develop. The north side of it is fronted by Highway 90, which is . . . a six or seven lane road. So the idea of people going to shop in the shopping area north of Highway 90 and parking over here is ludicrous. The property to the east has already been developed, as I understand it, that's usable for motels, and they've got their own parking facilities. So the only benefit for this parking lot is for the Jubilee Mall subdivision. You can't expand it to any other area or business based on the layout of the land."
This description of the property's location was not controverted and is vitally important to any analysis of this issue because the majority concludes that the public benefit conferred was that the parking lot *Page 756 
"may be used by persons who shop, eat, or work in the area of the parking lot." 825 So.2d. at 753. However, it is undisputed that because of its location, the only persons who "shop, eat, or work in the area of the parking lot" will be those persons who specifically shop, eat, or work at this particular retail mall, AIG and the tenants of which will maintain control over the use of the land. And despite the added "benefit" noted in the majority opinion that the "general population is not excluded. Anyone can use the parking lot," 825 So.2d at 753, neither AIG, the City, nor any other party has offered any explanation as to who — other than the tenants' patrons — would actually, or theoretically, visit the parking lot. Clearly, the location of the land further supports the Citizens' argument that this land will benefit primarily AIG and its tenants, not the general public.
Furthermore, the proposed benefit to the "general population" and to those "who shop, eat, or work in the area" from the City's purchase is illusory. Under AIG's proposal, the City will provide the parking lot for a retail mall. However, if AIG developed the project without the City's participation, the parking lot would still be provided. In other words, regardless of the City's expenditure of approximately $6 million, the same benefit, i.e., a parking lot for a retail mall, is provided.
More importantly perhaps, AIG's comments at the city council meetings indicate conclusively that the development was to benefit private parties — not the general public. During the July 17, 2000, city council meeting, AIG stated that its proposal to the City was the "means to an end" and that the parking lot was merely a "mechanism to fulfill the overall development." During the July 6, 2000, city council meeting, AIG stated that the reason it had requested that the City participate on the development was to "keep the rents for the tenants at a minimum, in orderto attract quality tenants. . . ." (Emphasis added.)
In rejecting a similar scheme as violating § 94, this Court has said: "[T]he sale of these tax-free bonds by the city of Hamilton would not serve a significant `public purpose,' but, instead would primarilybenefit the individual lessee through lower rentals." Brown v.Longiotti, 420 So.2d 71, 75 (Ala. 1982) (emphasis added). Here, AIG hoped to induce the City to subsidize AIG's commercial project by garnering financial support from the City; this support would allow AIG to lower rental payments by its tenants and would attract "quality tenants." In my opinion, these cannot legally qualify as public purpose.
Here, I do not believe that there is any evidence in the record to support a finding that the City's pecuniary liability is for a public purpose, other than AIG's unsupported assertion that the "general population will not be excluded." In fact, but for AIG's proposed retail mall, there would be no need for the proposed parking facility at all.
All of the evidence — including AIG's own admission — unequivocally indicates that this transaction is designed to benefit AIG and its tenants through financial incentives. Accordingly, I do not believe the Warrant is being issued for a public purpose.
This conclusion, however, does not necessarily end my inquiry as to whether the Warrant violates § 94, as amended by Amendment No. 112. Generally, a municipality does not violate § 94 by lending its credit to private individuals when it enters into ordinary commercial contracts with benefits and consideration flowing to both parties. See Ramer v.City of Hoover, 437 So.2d 455 (Ala. 1983); Rogers v. City of Mobile,277 Ala. 261, 169 So.2d 282 (1964). *Page 757 
Here, AIG argues that the Agreement is an ordinary commercial contract exempt from § 94, Ala. Const., 1901, because, it argues, the City, by paying $5,700,000, is receiving approximately 19 acres of land — albeit not until December 31, 2099. Because consideration flows to both parties, AIG reasons, the contract is exempt from the prohibition in § 94.
Although technically both parties to this contract have provided consideration, I believe the consideration provided to the City — a parcel of land that AIG will control for approximately 100 years and that will be used primarily to benefit AIG and its tenants through lower rental payments — is too remote and incidental in light of the undisputed evidence.
AIG, realizing that a potential problem exists regarding the consideration for the Agreement, urges this Court to follow our holding in Dothan Area Chamber of Commerce, Inc. v. Shealy, 561 So.2d 515, 517
(Ala. 1990). In that case, we expressed a reluctance to examine the adequacy of consideration in a similar context. In Shealy, however, we refused to inquire into the adequacy of the consideration "in [that] case" because no evidence of a constitutional violation existed. "After reviewing the record, this Court has found no evidence of a constitutional violation." 561 So.2d at 517 (emphasis added). Here, however, I am convinced that the overwhelming and undisputed evidence in this case suggests such a violation exists here.
Moreover, a city's pecuniary liability incurred primarily for the benefit of a private individual or corporation cannot escape § 94's proscription merely by designating the contract as an "ordinary commercial contract." To allow this result would eviscerate § 94 of all meaning because, by necessity, all contracts involve consideration flowing to both parties. "The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." Hargrove v. Tree of Life Christian Day Care Center,699 So.2d 1242, 1247 (Ala. 1997). If consideration flowing to both parties was sufficient to remove a contract from the prohibition of § 94, Ala. Const. 1901, that prohibition would arguably be inapplicable to any commercial transaction. Clearly, an arrangement cannot escape § 94's prohibition simply because both parties receive some benefit from the transaction.
In Montgomery v. Collins, 355 So.2d 1111 (Ala. 1978), this Court expounded upon the necessity of a public benefit in the context of the "ordinary commercial contract" exemption to § 94, Ala. Const., 1901. In Collins, the City of Montgomery expended public funds in the defense of Montgomery police officers who had been accused of perjury in their grand jury testimony. This Court ruled that the City's payment of the officers' legal defense did not violate § 94, Ala. Const. 1901, because the payment for the defense was in the "proper corporate interest" of the City, "i.e., for the benefit of the city, and thus identified with a public purpose. . . ." Collins, 355 So.2d at 1115.[2]
Thus, the Court held that the expenditure of city funds, even if it benefited individuals, was permissible so long as the benefit inured to the city and was "identified with a public purpose." This is still the law.
In fact, a review of those cases in which we have exempted commercial contracts from the prohibition of § 94 demonstrates that "ordinary commercial contracts," which are exempt from § 94's proscription, *Page 758 
must be for "proper corporate interests," "i.e., for the benefit of the city, and . . . identified with a public purpose." 355 So.2d at 1115 (emphasis added). See Mobile Wrecker Owners Ass'n v. City of Mobile,461 So.2d 1303 (a contract for a wrecker service to tow, store, and protect vehicles impounded by police or city is a commercial contract and does not violate § 94); Gober v. Stubbs, 682 So.2d 430 (Ala. 1996) (the construction of a roadway, "for the benefit of the commuting public," is an ordinary commercial contract and does not violate § 94); Taxpayers Citizens of the City of Foley v. City of Foley,527 So.2d 1261 (Ala. 1988) (the City of Foley's establishment of a mutual insurance company for the benefit of the City involved an ordinary commercial contract and did not violate § 94); Ramer v. City ofHoover, supra (a contract for the construction and operation of a sanitary sewage system is an ordinary commercial contract and does not violate § 94). These cases unequivocally demonstrate that "ordinary commercial contracts" must possess a significant nexus to a public benefit.
 "The limitation that public money and credit can only be used for `public purposes' is a matter of due process and implicit in the Alabama Constitution. Indeed, the premise that all appropriations or expenditures of public money by municipalities and indebtedness created by them must be for a public purpose as opposed to a private purpose is a widely recognized one."
Brown v. Longiotti, 420 So.2d 71, 72 (Ala. 1982) (citations omitted). SeeOpinion of the Justices No. 120, 254 Ala. 506, 510, 49 So.2d 175, 178
(1950) ("[T]he evil to be remedied is the expenditure of public funds in aid of private individuals or corporations, regardless of the form which such expenditure may take . . . ."); Garland v. Board of Revenue ofMontgomery County, 87 Ala. at 226, 6 So. at 403 ("A loan of credit, or grant of money or thing of value in aid of an individual or corporation, in any mode, directly or indirectly, falls within its operation. A direct loan or grant to the individual or corporation is not essential.").
I believe the undisputed evidence — including AIG's explicit admission — inexorably demonstrates that both the primary purpose and the result of the Agreement is to provide financial incentives to AIG and its future tenants. I thus conclude that the issuance of the Warrant violates § 94, Ala. Const. 1901, as amended by Amendment No. 112; accordingly, I respectfully dissent.
[2] In Collins, this Court correctly reasoned that a judgment against the officers could create "a risk of litigation against the City itself." 355 So.2d at 1114.