COOK, Justice
(concurring in part and dissenting in part).
I concur with those portions of the lead opinion holding (1) that the statute of limitations does not bar M.A.B.’s petition to reopen the question of his paternity; (2) that Ala. Code 1975, § 26-17A-1, does not, when applied prospectively, violate the principle of separation of powers; and (3) that the “reasonable time” element of Ala. R. Civ. P. *670 60(b)(6) is, in this class of cases, to be construed much more liberally than it has been in the past. I dissent, however, from that portion of the opinion holding that § 26-17A-1 violates the separation-of-powers principle if applied retroactively; therefore, I also dissent from the judgment of reversal.
7. Separation of Powers

A

Relying primarily on, and quoting, Judge Crawley’s dissent in K.M. v. G.H., 678 So.2d 1084, 1097 (Ala.Civ.App.1995), Jenkins, the guardian ad litem for the minor child, contends that “ ‘the legislature may not, without violating the separation of powers doctrine, order a court to reopen a final judgment and grant a new trial.’ ” Brief in Support of Petition of Guardian ad Litem for Writ of Certiorari, at 13. Cases cited in support of this proposition are: Sanders v. Cabaniss, 43 Ala. 173 (1869); Lawson v. Jeffries, 47 Miss. 686 (1873); Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878); and Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952). Because, he insists, § 26-17A-1 has this effect, it violates the separation-of-powers principle. I find these cases to be inapposite.
Sanders v. Cabaniss involved the effect of Act No. 59, §§ 5-6, 1868 Ala. Acts 415, which, significantly, was entitled: “An act to delare void certain judgments, and to grant new trials in certain cases therein mentioned, and to repeal sections 2876 and 2877, of the [Ala.Code 1867].” (Emphasis added.) Section 5 provided:
“That any judgment or decree rendered since the 25th day of May, 1865, when the original cause of action originated prior to that date, such judgment or decree shall be opened on application, as hereinbefore provided, accompanied with an affidavit that such cause of action did originate prior to the 25th day of May, 1865.”
Section 6 provided: “That on all new trials of causes originating under the provisions of this act, the defendant shall be entitled to all the rights he would have had if no suit had been previously commenced.” (Emphasis added.)
Pursuant to these provisions of the statute, and upon the motion of William H. Sanders and Virginia H. Markham, a court of chancery, on January 1,1869, reinstated an action in which a decree had been entered on August 11, 1868. 43 Ala. at 174-75. That decree had established a lien, which was to be satisfied by Sanders and Markham, against “certain lands.” Id. at 174. The broad, substantive issue presented to this Court was whether the above-quoted provisions of the statute violated the principle of separation of powers. The Court held that they did.
In so holding, it explained that the “lines of separation” between powers allocated to the judicial and legislative departments respectively “some times approach so near to each other, that, in some cases, it requires great precision to determine where the true line of separation is.” Id. at 180. The Court then set forth some general principles applicable in defining the “line of separation.” It explained, for example: “ ‘[T]o declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative-’” Id. at 180 (emphasis added). “It has been said, that which distinguishes a judicial from a legislative act is,” the Court continued, “that the one is a determination what is the existing law in relation to some particular thing already done or happened, while the other is a predetermination of what the law shall be, for the regulation and government of all future cases falling under its provisions.” 43 Ala. at 181.
The Court in Sanders also relied in part on Alabama Life Insurance & Trust Co. v. Boykin, 38 Ala. 510 (1863), explaining:
“In [Boykin ], the court decide[d] that the first section of the act of February 8th, 1858, ... which provides, that conveyances by husband and wife heretofore made, shall not be held insufficient in law, on account of defects in the certificate of acknowledgment, is unconstitutional. The court [held] that the passage of the act was an attempt to make valid and effective, that which was before inoperative and void; effective, to divest a title out of one, and vest it in another, and this by a mere edict of legislation; an attempt to declare, not only what the law shall be, but what the law has been....”
*671 43 Ala. at 187 (emphasis added). The Court concluded that Act No. 59, § 5, violated the separation-of-powers principle in that it rendered the chancellor “the mere instrument of the legislature to register their will; nothing more.” 43 Ala. at 188.
Similarly, in the second case cited by Jenkins, the Virginia Court of Appeals held that the legislature could not constitutionally grant the judiciary power to void and set aside a final judgment for the purpose of depreciating the amount of the judgment to its value in Confederate currency. Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878). The court explained:
“When the act under which the claim in this case is asserted was passed, the defendant in error (Anderson) had recovered a judgment against Ratcliffe. That judgment was a final adjudication of the rights of the paries, and had so stood for nearly seven years before the passage of the act. The rights of Anderson and those claiming under him had become fixed and vested; and any attempt on the part of the legislature to impair these vested rights was an invasion of judicial authority, and must be treated as unconstitutional and void.
“... Such an act ‘professes to grant to one party in a cause which has been, according to existing laws, finally decided, special authority to compel the other party, contrary to the general law of the land, to submit his cause to another court for trial; the consequence of which may be the total (or partial) loss of all those rights, or all that property which the judgment complained of had entitled him, and those claiming under him, to hold and enjoy
72 Va. (31 Gratt.) at 110 (emphasis added).
In the third case cited by Jenkins, the Supreme Court of Mississippi considered the constitutionality of an act passed by the Mississippi legislature purporting to abrogate and annul all judgments entered between January 9, 1861, and April 29, 1868, upon an affidavit by the unsuccessful litigant stating that the affiant had not been represented by counsel in the prior adjudication. Lawson v. Jeffries, 47 Miss. 686 (1873). The court stated:
“ ‘[A] judgment of a court becomes final when, by the then existing laws, the time for a review and for reversal for error has expired; it then becomes a vested right, by force of the constitution and the existing laws; and a statute designed to retroaet on such a case, by reviving the right of review, is unconstitutional and void.’ ”
Id. at 701. The court concluded that the act “was a judicial act [as opposed to legislative], and, therefore, unauthorized.” Id. at 707.
Finally, Jenkins cites Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952), in which this Court held that the legislature could not require the judiciary summarily to grant a criminal defendant a new trial merely upon a showing that the “prosecuting attorney [made some] comment concerning the defendant’s failure to testify.” Id. at 415, 60 So.2d at 702. It reasoned that a legislative act having that effect would “deprive the circuit court of its constitutional power to function in a judicial way in that respect.” Id. at 418, 60 So.2d at 704.

B.

At first glance, the 19th century cases cited by Jenkins appear to support his argument. Closer examination, however, reveals that they resemble this case only superficially. Indeed, more to the point are more recent United States Supreme Court decisions, which I will now discuss, considering their applications to the peculiar facts of this case, and contrasting this case with those cases cited by Jenkins.[21]
United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), is particularly analogous to this case. There, the Supreme Court considered whether Congress could, without violating the principle of separation of powers, authorize the *672 United States Court of Claims to reopen and relitigate a claim against the United States barred by the doctrine of res judicata, “to take new evidence in the case, and to conduct its review on the merits de novo.” Id. at 389, 100 S.Ct. 2716. It answered that question in the affirmative.
That claim was asserted by the Sioux Nation against the United States, seeking compensation, with interest accruing from 1877,[22] for the “taking” of the Black Hills of South Dakota without just compensation. It was first adjudicated in 1942 and a judgment rendered in favor of the United States. Id. at 384, 100 S.Ct. 2716. See Sioux Tribe of Indians v. United States, 97 Ct.Cl. 613 (1942), cert. denied, 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943). At that time, the Court of Claims held that it was not legally authorized “to question whether the compensation afforded the Sioux by Congress in 1877 was an adequate price for the Black Hills.” 448 U.S. at 384,100 S.Ct. 2716.
Subsequently, Congress enacted legislation creating an “Indian Claims Commission” (the “Commission”) to inquire into “tribal grievances.” Id. See Indian Claims Commission Act, 25 U.S.C. § 70 et seq. The Sioux Nation reasserted its claim with the Commission, which concluded that the United States was liable to pay “just compensation for the taking of the Black Hills.” 448 U.S. at 386, 100 S.Ct. 2716. The United States appealed to the Court of Claims, which, in 1975, “held that the merits of the Sioux’ taking claim had been reached in 1942, and ... was [in 1975] barred by res judicata.” Id. at 388,100 S.Ct. 2716 (emphasis added). See United States v. Sioux Nation, 207 Ct.Cl. 234, 518 F.2d 1298, cert. denied, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).
Three years later, Congress passed Pub.L. 95-243, 92 Stat. 153, amending 25 U.S.C. § 70s(b); that new law provided for de novo review in the Court of Claims “of the merits” of the taking claim, “without regard to the defenses of res judicata and collateral estop-pel.” 448 U.S. at 389, 100 S.Ct. 2716. Pursuant to that statute, the Court of Claims reexamined the merits of the Sioux Nation’s claims. Id. It held that the “1877 Act [had] effected a taking of the Black Hills,” for which the United States was required to pay just compensation, and it awarded the Sioux Nation a sum representing the 1877 fair market value of the Black Hills, plus annual interest “dating from 1877.” Id. at 389, 390, 100 S.Ct. 2716.
On the petition of the United States for certiorari review, the Supreme Court considered, among other things, whether Congress violated the separation-of-powers doctrine in providing for the abrogation of the Court of Claims judgments of 1942 and 1975, and the reconsideration of the merits of the Sioux Nation’s claims. Id. at 391, 100 S.Ct. 2716. The Court concluded that it had not. Id. at 397, 100 S.Ct. 2716. It explained that “Congress has the power to waive the res judicata effect of a prior judgment entered in the Government’s favor on a claim against the United States.” Id. Sioux Nation’s rationale applies with equal force to the situation presented in this case. This is .so because the Alabama Legislature, no less than Congress, possesses the power to enact legislation waiving the res judicata effect of a judgment entered in its favor on a claim against the State. A paternity adjudication in a case where the State has provided assistance through the “Aid to Families with Dependent Children” program (“AFDC”), or in which the action was brought in the name of the State, pursuant to Ala.Code 1975, § 26-17-7,[23] is a judgment in favor of the State, and the readjudication of paternity pursuant *673 to § 26-17A-1 is a claim “against,” or adverse to, the State.
These conclusions follow from the role exercised by the State in providing AFDC, pursuant to the Child Support Programs, Ala.Code 1975, §§ 38-10-1 to -53, and in bringing actions pursuant to § 26-17-1, which is the statutory directive providing that paternity actions be brought in the name of the State of Alabama. For example, the Child Support Programs authorize the Department of Human Services (“DHR”) to “operate [such] child support programs [as] locating absent parents, establishing paternity, establishing or modifying support orders, enforcing support obligations and related matters.” Section 38-10-3(a). “As a condition of eligibility for aid, each recipient of aid to families with dependent children shall be deemed, by accepting aid, to have made an assignment to the department of the right to any support owed up to the amount of aid paid by the department_” Section 38-10-4. DHR is then “subrogated to the right of such child or recipients ... to collect and receive all child support payments and to initiate any support action existing now or in the future under the laws of Alabama.” Id. Having disbursed public funds for AFDC, and, consequently, having acquired the right of subrogation, the State becomes the real party in interest in litigation affecting its right of recovery. Ex parte W.J., 622 So.2d 358, 363 (Ala.1993) (Houston, J., dissenting); State ex rel. Robertson v. Robertson, 675 So.2d 422, 424-25 (Ala.Civ.App.1995).
Thus, a paternity adjudication in a case where the State has provided AFDC is a judgment in favor of the State. Conversely, an action pursuant to § 26-17A-1 to set aside a prior adjudication of paternity is a claim “against,” or adverse to, the State, because, if the prior adjudication is set aside, the State loses its right to recoup AFDC payments it has made from the party formerly adjudicated liable for child support.
The real effect, therefore, of § 26-17A-1 is to deny the State the benefit of a res judicata defense in those cases in which the State has acquired an interest. This the legislature may do without violating the doctrine of separation of powers. Sioux Nation, supra.
In that respect, § 26-17A-1 differs remarkably from the statutes invalidated in the cases on which Jenkins relies. Very simply, none of the statutes under review in those cases involved claims against the State— directly implicating the state treasury. But there are other dispositive distinctions that will become more apparent after a brief discussion of Plaut v. Spendthrift Farm,, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).
The dispute in Plaut involved the power of Congress retroactively to reopen — in private, civil actions based on the Securities Exchange Act of 1934, § 10(b), codified as amended, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5 — final judgments holding that the claims were barred by the limitations period applicable when the judgments became final. The legislative action reviewed in Plaut was Congress’s response to Lampf, Plena, Lipkind, Prwpis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Supreme Court decided, for the first time, that the limitations period applicable to private actions alleging violations of § 10(b) and Rule 10b-5 was “one year after the discovery of the facts constituting the violation and ... three years after such violation.” 514 U.S. at 213, 115 S.Ct. 1447. The lower federal courts had, until Gilbertson was decided, applied “applicable state limitations period[s].” 514 U.S. at 216, 115 S.Ct. 1447.
In response to Gilbertson, Congress amended the Securities Exchange Act of 1934 by a provision codified at 15 U.S.C. § 78aa-l. The amendment provided that any such action that was “commenced on or before” the Gilbertson decision; that was adjudicated on the basis of the new rule to be “time barred,” but would have been “timely” under the former rule; could “be reinstated on motion by the plaintiff.” See 514 U.S. at 214-15, 115 S.Ct. 1447. The Court held that § 78aa-l, “to the extent ... it require[d] federal courts to reopen final judgments in private civil actions under § 10(b),” violated the principle of separation of powers. 514 U.S. at 213,115 S.Ct. 1447.
*674 In the Court’s view, the validity of § 78aa-1 turned on whether it operated ‘prospectively or retroactively. According to the Court, “Congress could undoubtedly enact prospective legislation permitting, or indeed requiring, [a court] to make equitable exceptions to an otherwise applicable rule of finality, just as district courts do pursuant to Rule 60(b),” 514 U.S. at 237, 115 S.Ct. 1447 (emphasis in original). More specifically, if the law applicable to the case at the time the judgment is entered “says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned.” 514 U.S. at 234, 115 S.Ct. 1447.
What Congress could not do, the Court explained, was “‘reverse a determination once made, in a particular case.’ ” 514 U.S. at 225, 115 S.Ct. 1447. “When retroactive legislation requires its own application in a case already finally adjudicated,” the Court continued, “it does no more and no less than ‘reverse a determination once made, in a particular case.’ ” Id. at 225, 115 S.Ct. 1447 (emphasis added). “Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was.” 514 U.S. at 227, 115 S.Ct. 1447 (emphasis in original). The Court concluded that § 78aa-1 was legislation of the latter type, and, therefore, unconstitutional. 514 U.S. at 227-28,115 S.Ct. 1447.
The Court’s discussion of § 78aa-l illustrates a fundamental distinction between that statute and § 26-17A-1, the statute involved in this case. In fact, the legislation involved in Sanders v. Cabaniss, 43 Ala. 173 (1869); Lawson v. Jeffries, 47 Miss. 686 (1873); and Ratcliffe v. Anderson, 72 Va. (31 Gratt.) 105 (1878), differed in no substantive respect from that in Plant. The legislation, which, in all four cases, was fully retroactive, aimed to allow the losing party to retry the case with the possibility of getting a judgment in his favor. In other words, every case involved the destruction of rights that had become fully vested by the prior adjudication.
In Sanders, for example, the statute provided that “on all new trials of causes originating under the provisions of [the] act, the defendant [should] be entitled to all the rights he would have had if no suit had been previously commenced.” Act No. 59, § 6, 1868 Ala. Acts 415 (emphasis added). In this way, Act No. 59 divested Cabaniss of the right to enforce the lien to which he was entitled pursuant to the prior adjudication. Thus, Act No. 59 not only destroyed rights that had vested in plaintiffs, but subjected plaintiffs to the possibility of liability to the defendants in subsequent actions. See also Alabama Life Insurance & Trust Co. v. Boy-kin, 38 Ala. 510, 513 (1863) (separation-of-powers doctrine prohibits legislation that, in voiding a judgment, “divest[s] a title out of one, and vest[s] it in another”).
This feature of Act No. 59 was characteristic of the legislation involved in the other three cases. See Plant (under § 78aa-la, a Rule 10b-5 action defendant, whose nonliability had been adjudicated, faced anew the prospect of liability to the plaintiff); Lawson, 47 Miss, at 701 (a judgment “becomes a vested right, by force of the constitution and the existing laws; and a statute designed to retroact on such a case ... is unconstitutional and void”); Ratcliffe, 72 Va. (31 Gratt.) at 110 (“[t]he rights of Anderson and those claiming under him had become fixed and vested; and any attempt on the part of the legislature to impair these vested rights was an invasion of judicial authority, and must be treated as unconstitutional and void”).
By contrast, § 26-17A-1 disturbs no vested right. This is so, partly because of the peculiar nature of the subject matter it concerns, and partly because of § 26-17A-2, which narrowly restricts the statute’s operation and effect. As to the scope of its operation and effect, § 26-17A-2 provides: “In any decree setting aside an order of paternity pursuant to this chapter, there shall be no ... reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State.” (Emphasis added.) Thus, § 26-17A-2 expressly prohibits a paternity defendant from recovery of any sort, including past payments of child support. In doing so, it focuses exclusively on the duty to pay child support, rendering the operation and effect of § 26-17A-1 prospective only. In other words, the only *675 relief afforded a party seeking to set aside a prior paternity adjudication is purely prospective — prospective from the date of the second judgment. In this way, § 26-17A-1 differs fundamentally from the retrospective statutes invalidated in Plaut, Sanders, Lawson, and Ratcliffe.
Similarly, the peculiar nature of the subject matter upon which the statute operates brings it squarely within the class of legislation Plaut excepted from the constitutional prohibition. To reiterate, Plaut stated that “Congress could undoubtedly enact prospective legislation permitting, or indeed requiring, [a court] to make equitable exceptions,” 514 U.S. at 237, 115 S.Ct. 1447 (emphasis in original), and that if the law applicable to the case at the time the judgment is entered “says that the judgment may be reopened for certain reasons, that limitation is built into the judgment itself, and its finality is so conditioned.” 514 U.S. at 234, 115 S.Ct. 1447.
These principles have particular application to § 26-17A-1, because judgments ordering the payment of child support are always modifiable upon a showing of changed circumstances. Ala. R. Jud. Admin. 32(A)(3); Hall v. Hall, 280 Ala. 275, 192 So.2d 727 (1966); Whitt v. Whitt, 276 Ala. 685, 166 So.2d 413 (1964); Jones v. Jones, 682 So.2d 1387 (Ala.Civ.App.1996); Williams v. Williams, 601 So.2d 1023 (Ala.Civ.App.1992); Lee v. Lee, 518 So.2d 137 (Ala.Civ.App.1987). Child support payments become “final judgments” only upon accrual. Ex parte State ex rel. Lamon, 702 So.2d 449, 450 (Ala.1997). Corollarily, “judgments as to child support are never res judicata.” Tucker v. Tucker, 681 So.2d 592, 594 (Ada.Civ.App.1996); Thistlethwaite v. Thistlethwaite, 590 So.2d 317 (Ala.Civ.App.1991). Thus, no party has a vested right to unaccrued child support payments. Based on these principles, I conclude that § 26-17A-1, which affects only such payments as were unaccrued as of the time the statute was enacted, disturbs no vested right.
Also significant is the fact that each support payment becomes a “final judgment” upon accrual. Ex parte State ex rel. Lamon, supra. Section 26-17A-1 attached, therefore, to the first such “judgment” that accrued after passage of the statute, and to every such “judgment” as it accrued thereafter. In other words, § 26-17A-1 became the law applicable to the case, governing the defendant’s duty to pay child support on the basis of every payment that accrued after passage of the statute. In that way, § 26-17A-1, which “says that the judgment may be reopened for certain reasons,” was “built into the judgment itself, and its finality [became] so conditioned.” 514 U.S. at 234, 115 S.Ct. 1447. This, the legislature may do.
Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952), the fourth case cited by Jenkins, differs from the other three in that Broadway did not involve retroactivity. However, Broadway is distinguishable from this case in other respects. In Broadway, a criminal defendant was granted a new trial based on a single comment made by the solicitor during the trial, namely: “‘[Defendant’s counsel] criticizes our witness in this case, but [defendant’s counsel] has not given us any witness to criticize.’” Id. at 415, 60 So.2d at 702. The defendant did not object or, in any way, direct the trial court’s attention to the remark until it was made the basis of a motion for a new trial, pursuant to Act No. 124,1949 Ala. Acts 150, which, as I have stated previously in this opinion, provided: “If the solicitor or other prosecuting attorney makes any comment concerning the defendant’s failure to testily, a new trial must be granted.... ” The statute applied to every “criminal pro-ceedingt ]” conducted in Alabama. Id.
This Court stated that a legislative act having that effect would “deprive the circuit court of its constitutional power to function in a judicial way in that respect.” 257 Ala. at 418, 60 So.2d at 704. Of the statute, the Court observed:
“This was supposed to make it mandatory upon the circuit court to grant the motion for a new trial when any such comment is made during the progress of the trial, although no objection was made to such comment, and it may not appear that the comment was made in the presence of the jury, and although it may not appear that the comment was of such character as to be prejudicial to the defendant, and may *676 have been of such character as that it could have been easily eradicated from the mind of the jury by prompt instructions from the court, and although it is possible that such would have been done if objection had been made.”
257 Ala. at 415-16, 60 So.2d at 702 (emphasis added).
Obviously, because of its very breadth and its application in every “criminal proceeding,” this statute would have played havoc with the judiciary. Orderly judicial process in all criminal proceedings would have become an anachronism. It is easily seen that the statute represented an extreme example of such legislative intrusion as is prohibited by the separation of powers.
Section 26-17A-1 is, by contrast, singularly un intrusive. It is narrowly drafted and applies in a very narrow class of cases. Moreover, when it does apply in a particular case, it does nothing to interfere with the orderly judicial process in the case. Unlike the statute in Broadway, § 26-17A-1 does nothing to impugn the effect or operation of statements or evidence presented in the prior adjudication. In other words, it leaves the trial court free to function judicially in the prior, as well as in the subsequent, paternity adjudication. For these reasons, § 26-17A-1 does not violate the principle of separation of powers.

II. Public Policy

Finally, Jenkins contends that § 26-17A-1 violates public policy. Specifically, he states: “Our state’s public policy has heretofore prohibited parents from abandoning their parental responsibilities once voluntarily assumed.” Brief in Support of Petition for Writ of Certiorari, at 17. “Section 26-17A-1 is against the policy of the state,” he adds, “if no timeliness requirement is [read into] to the statute.” Id. at 19 (emphasis added).
These contentions essentially mirror the public-policy challenges to § 26-17A-1 that were addressed and rejected by the Court of Civil Appeals in K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995). That court in KM. reversed a judgment of the trial court that had held that § 26-17A-1 “violates the public policy favoring the legitimacy of children and the right to rely on finality of judgments.” 678 So.2d at 1086. Because the Court of Civil Appeals’ discussion of the public policy argument is particularly succinct and applicable to this case, I include substantial portions of that discussion:
“K.M. contends that the trial court erred in finding that the Act violates the public policy of the State of Alabama. The State argues that the Act violates the strong public policy which favors the legitimation of children and the public policy in favor of the finality of judgments.
“‘When the legislature of a state has acted on a subject within constitutional authority, public policy is what the statute enacted says or indicates. Thus a constitutional statute cannot be contrary to public policy — it is public policy.’ Higgins v. Nationwide Mutual Insurance Co., 50 Ala.App. 691, 694, 282 So.2d 295, 298 (1973).
“We find a part of KM.’s brief on appeal, as it relates to the public policy established by this Act, worthy of quoting:
“‘In that regard, it is important to understand that these extraordinary remedies manifest a more important public policy than any of the ones cited by the Trial Court. That public policy involves ensuring public confidence in the edicts of our courts. It is quite obvious that where blatant injustices are allowed to stand, there is an erosion in public support [and] confidence in our court system. Accordingly, where, as in the instant case, the [defendant] can be conclusively established as a matter of fact not to be the father of a child and to be required to ‘in lav/ be the father of a child, it lessens the respect on which the decisions of the court are given. Thus, these extraordinary remedies which have been carved out by the legislature and the courts to attack judgments which are clearly inconsistent with the “finality of judgments,” are designed to provide mechanisms by which justice is assured. Their availability to correct obvious injustices within our Courts [is] an essential cornerstone of Anglo-American jurisprudence. It is axiomatic, *677 that where there is no remedy, there is no right. In this regard, the Alabama Legislature was acting in accord with the most basic principles in our society in providing a remedy to correct an obvious injustice and vindicate a right. That remedy is narrowly circumscribed and of limited availability.’
“The trial court erred in holding that the Act violates the public policy of the State.” 678 So.2d at 1087 (emphasis added).
As the Court of Civil Appeals correctly observes, it is quintessentially the prerogative of the legislature to declare and define public policy. Rogers v. City of Mobile, 277 Ala. 261, 281, 169 So.2d 282, 302 (1964) (“Except as inhibited by specific constitutional provisions, the Legislature has the power to determine and declare the public policy of the state ....”); see Giuliani v. Guiler, 951 S.W.2d 318, 321 (Ky.1997) (“It is beyond challenge that public policy is determined by the constitution and the legislature through the enactment of statutes.”); Michaels v. Nemethvargo, 82 Md.App. 294, 309, 571 A.2d 850, 857 (1990) (“the judiciary has generally declared that it is the province of the Legislature to determine the public policy of the State”). To the extent, therefore, that the statute is constitutional — and I would hold that it is — the legislature has the right to declare the public policy of the State on this question.
These disclaimers notwithstanding, I point out that the policy implemented by § 26-17A-1 has much to commend it in relation to the rules the judiciary had formulated based on its conception of former policy. In at least one class of cases, the former policy, as it was understood and applied by the courts of Alabama, worked results that were manifestly inconsistent and fundamentally unfair. That was so when the policy combined with “ ‘[plater est quern nuptiae demonstrat — the presumption that the husband of the mother of a child born during marriage is the father of that child.’ ’[24] Ex parte Presse, 554 So.2d 406, 413 (Ala.1989). The presumption “‘is often said to be one of the strongest presumptions known to the law.’ ” Id. In Alabama, it was not “conclusive,” but could be rebutted “by proof of impotency on the husband’s part, or by want of access to his wife during the time when pregnancy might have occurred, and other conditions in which it was impossible that the husband could have been the father of the child of his wife [born] during the marriage.” Adams v. State, 428 So.2d 117, 120 (Ala.Civ.App.1983). See Jackson v. Jackson, 259 Ala. 267, 66 So.2d 745 (1953). The anomalies resulting from the combination of pater est quern nuptiae de-monstrat with former, public-policy notions are illustrated by the following hypothetical.
Assume that Mr. and Mrs. A were married on January 1, 1980. Baby Aj was bom on January 1,1981, Baby A2 on January 1,1983, and Baby A3 on January 1, 1985. Mr. and Mrs. A obtained a final judgment of divorce on January 1, 1987. Mr. A was ordered to make periodic payments for the support of the children.
The marital presumption applies to all three children. But, assume that, in fact, Babies Ai and A3 are not the children of Mr. A. Assume not only that this fact was unknown to Mr. A, but, also, that he had no information at the time of the divorce that would have put him on notice of that fact. Assume further that in 1997, Mr. A discovered, for the first time, facts that caused him to question Mrs. A’s fidelity and that he promptly petitioned the court, pursuant to Rule 60(b), to reopen and reexamine the question of the paternity of the children.
If Mr. A argues to the trial court that he, like all the world, did, and should have been able to, rely on the marital presumption, namely, that he was the father of the children born to Mrs. A during the marriage, his argument will be rejected summarily. That is so, because cases decided before the adoption of § 26-17A-1 that would have barred his petition as untimely are legion. He will learn that he should have challenged paternity at the time of the divorce. Mr. A will *678 learn, in other words, that all the world was entitled to rely on this presumption, except the husband of the wife, whose children were born during the marriage.
In practice, therefore, a husband — unlike all others — was deemed to have relied on the marital presumption at his peril. In order to avoid the untimeliness bar of Rule 60(b), he was required to challenge his wife’s fidelity at the earliest opportunity, thus adding to the trauma of a disunited family. Rule 60(b), as applied by our courts to such cases, in effect, penalized husbands who were not always latently, at least, suspicious of their wives. These are “public policies” of which, by the passage of § 26-17A-1, we are well rid.
Furthermore, under the peculiar circumstances out of which paternity adjudications arise, it is fundamentally unfair to ignore— on the basis of res judicata — evidence that incontrovertibly eliminates the defendant as the biological father, where the other party to that intimate relationship has, in the initial proceeding, either misrepresented the truth to the court and to the defendant, or, as the plaintiff did in this case, suppressed crucial information about paternity. But “fundamental fairness” is the “touchstone,” or essence, of due process. Walters v. National Ass’n of Radiation Survivors, 473 U.S. 305, 364 n. 11, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (superseded on other grounds by 102 Stat. 4105, 4113-22); Gagnon v. Scarpelli, 411 U.S. 778, 790, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (modified in part on other grounds by statute). “Court proceedings are held for the solemn purpose of endeavoring to ascertain the truth which is the sine qua non of a fair trial.” Estes v. Texas, 381 U.S. 532, 540, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). “It is precisely the function of a judicial proceeding to determine where the truth lies.” Imbler v. Pachtman, 424 U.S. 409, 439, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring in the judgment).
Thus, § 26-17A-1 was enacted to address the injustice that results when a man is required to support a child where scientific evidence excludes him as the father, and it arose naturally out of the reluctance of the judiciary in cases such as this one to remedy that injustice. Also, it illustrates a legal system that is struggling to adjust to the new and ever-changing realities thrust upon it by rapidly accelerating advancements in society’s genetic identification capacity.
Finally, this opinion should not be construed as callous toward the interests of children. To be sure, there is a facile advantage to children to be supported by some man, even one who is not the biological father. But this advantage is only a short-term advantage. Children also have strong interests in knowing who, in fact, their fathers are, or, conversely, in knowing who their fathers are not.
While debate continues over the relative influences of heredity and environment, one thing is clear — the mystic bonds of blood are strong. The strength of these bonds is illustrated in various ways and is observable in ordinary experience. A familiar example is that of adopted children who are nurtured to maturity by exemplary adoptive parents, but, nevertheless, ultimately feel compelled to seek out their biological parents.
A strong sense of personal identity is an asset, and personal identity derives in large measure from knowledge of, and association with, individuals of biological kinship. Thus, blood bonds can, and do, provide long-term stability and support. Section 26-17A-1 does nothing to impair that long-term goal, and, in fact, facilitates it.
In summary, § 26-17A-1 does not violate the principle of separation of powers, even when applied “retroactively.” It simply focuses on the duty to pay child support and prohibits a paternity defendant from a recovery of any sort, including past payments of child support. The legal and practical effect of § 26-17A-1 is purely prospective. Therefore, I concur in part and dissent in part.

. Of course, the separation-of-powers decisions of federal courts do not control the application of this principle in cases based on the Alabama Constitution. Because the concept has the same genesis, however, whether applied in the court system of the United States or in the court system of Alabama, decisions of the United States Supreme Court are highly persuasive. See Quinton v. General Motors Corp., 453 Mich. 63, 77-78, 551 N.W.2d 677, 683 (1996).

. The Act of February 28, 1877, 19 Stat. 254 (“the 1877 Act”), codified an “agreement” in which the Sioux Nation ceded the Black Hills to the United States. 448 U.S. at 382-83, 100 S.Ct. 2716.

. Section 26-17-7 provides:
"Actions commenced under this chapter by the Department of Human Resources shall be in the name of the State of Alabama on relation of the complaining witness or party against the person claimed to be the father or against the person alleged to owe a duty of support as the defendant. In any action brought by the department, the district attorney, special prosecutor, or attorney otherwise authorized to represent the State of Alabama shall appear and prosecute the proceedings brought under this chapter."
(Emphasis added.)

. The presumption applies in this case because J.M.B was born within the 300-day, statutory period. See Ala.Code 1975, § 26-17-5(a)(l) ("A man is presumed to be the natural father of a child if ... the child is born during the marriage, or within 300 days after the marriage is terminated by ... divorce”).